# Exhibit 9

2001 Bilateral Trade Agreement

Agreement Between the United States and
Socialist Republic of Vietnam on Trade Relations

### AGREEMENT BETWEEN
### THE UNITED STATES OF AMERICA
### AND THE SOCIALIST REPUBLIC OF VIETNAM
### ON TRADE RELATIONS

The Government of the United States of America and the Government of the Socialist Republic of Vietnam (hereinafter referred to collectively as "Parties" and individually as "Party"),

Desiring to establish and develop mutually beneficial and equitable economic and trade relations on the basis of mutual respect for their respective independence and sovereignty;

Acknowledging that the adoption of and compliance with international trade norms and standards by the Parties will aid the development of mutually beneficial trade relations, and should be the underlying basis of those relations;

Noting that Vietnam is a developing country at a low level of development, is in the process of economic transition and is taking steps to integrate into the regional and world economy by, *inter alia*, joining the Association of Southeast Asian Nations (ASEAN), the ASEAN Free Trade Area (AFTA), and the Asia Pacific Economic Cooperation forum (APEC), and working toward membership in the World Trade Organization (WTO);

Having agreed that economic and trade ties and intellectual property rights protection are an important and necessary element in the strengthening of their bilateral relations; and

Being convinced that an agreement on trade relations between the Parties will best serve their mutual interests,

Have agreed as follows:

# CHAPTER I

# TRADE IN GOODS

### Article 1
### Most Favored Nation (*Normal Trade Relations*)[1]

1.      Each Party shall accord immediately and unconditionally to products originating in or exported to the territory of the other Party treatment no less favorable than that accorded to like products originating in or exported to the territory of any third country in all matters relating to:

> A.      customs duties and charges of any kind imposed on or in connection with importation or exportation, including the method of levying such duties and charges;

> B.      methods of payment for imports and exports, and the international transfer of such payments;

> C.      rules and formalities in connection with importation and exportation, including those relating to customs clearance, transit, warehouses and transshipment;

> D.      taxes and other internal charges of any kind applied directly or indirectly to imported products;

> E.      laws, regulations and other requirements affecting the sale, offering for sale, purchase, transportation, distribution, storage and use of products in the domestic market; and

> F.      the application of quantitative restrictions and the granting of licenses.

2.      The provisions of paragraph 1 of this Article shall not apply to action by a Party which is consistent with such Party's obligations under the World Trade Organization and the agreements administered thereby.  A Party shall nonetheless extend to the products originating in the territory of the other Party most-favored nation treatment in respect of any tariff reductions resulting from multilateral negotiations under the auspices of the World Trade Organization provided such Party accords such benefits to all other WTO members.

3.      The provisions of paragraph 1 of this Article shall not apply to:

---

[1]      As used in this Agreement, the term "normal trade relations" shall have the same meaning as the term "most favored nation" treatment.

    A.    advantages accorded by either Party by virtue of such Party's full membership in a customs union or free trade area, and

    B.    advantages accorded to third countries for the facilitation of frontier traffic.

4.    The provisions of sub-paragraph 1.F of this Article shall not apply to trade in textiles and textile products.

## Article 2
## National Treatment

1.    Each Party shall administer tariff and nontariff measures affecting trade in a manner which affords meaningful competitive opportunities for products of the other Party with respect to domestic competitors.

2.    Accordingly, neither Party shall impose, directly or indirectly, on the products of the other Party imported into its territory, internal taxes or charges of any kind in excess of those applied, directly or indirectly, to like domestic products.

3.    Each Party shall accord to products originating in the territory of the other Party treatment no less favorable than that accorded to like domestic products in respect of all laws, regulations and other requirements affecting their internal sale, offering for sale, purchase, transportation, distribution, storage or use.

4.    In addition to the obligations of paragraphs 2 and 3 of this Article, the charges and measures described in paragraphs 2 and 3 of this Article shall not otherwise be applied to imported or domestic products so as to afford protection to domestic production.

5.    The obligations of paragraphs 2, 3 and 4 of this Article shall be subject to the exceptions set forth in Article III of GATT 1994 and Annex A to this Agreement.

6.    Consistent with the provisions of GATT 1994, the Parties shall ensure that technical regulations and standards are not prepared, adopted or applied with a view to creating obstacles to international trade or to protect domestic production. Furthermore, each Party shall accord products imported from the territory of the other Party treatment no less favorable than the better of the treatment accorded to like domestic products or like products originating in any third country in relation to such technical regulations or standards, including conformity testing and certification. Accordingly, the Parties shall:

    A.    ensure that any sanitary or phytosanitary measure which is not inconsistent with the provisions of the GATT 1994, is applied only to the extent necessary to protect human, animal or plant life or health, is based on scientific principles and is not

-3-

maintained without sufficient evidence (*i.e.*, a risk assessment), taking into account the availability of relevant scientific information and regional conditions, such as pest free zones;

B.    ensure that technical regulations are not prepared, adopted or applied with a view to or with the effect of creating unnecessary obstacles to international trade.  For this purpose, technical regulations shall not be more trade-restrictive than necessary to fulfil a legitimate objective, taking into account the risks non- fulfillment would create.  Such legitimate objectives include national security requirements; the prevention of deceptive practices; protection of human health or safety, animal or plant life or health, or the environment.  In assessing such risks, relevant elements of consideration include available scientific and technical information, related processing technology or intended end- uses of products.

7.    Upon the entry into force of this Agreement, each Party shall grant trading rights to the nationals and companies of the other Party.  With respect to Vietnam, such trading rights shall be granted in accordance with the following schedule:

A.    Upon entry into force of this Agreement, all domestic enterprises shall be allowed to engage in trading activities in all products, subject to restrictions listed in Annexes B and C.

B.    Upon entry into force of this Agreement, enterprises with capital directly invested by U.S. nationals and companies shall be allowed, subject to the restrictions in Annexes B and C, to import goods and products to be used in, or in connection with their production or export activities whether or not such imports are specifically identified in their initial investment license.

C.    Three years after entry into force of this Agreement, enterprises with capital directly invested by U.S. nationals and companies, in production and manufacturing sectors, shall be allowed to engage in trading activities, subject to the restrictions listed in Annexes B, C and D, and provided such enterprises are (i) engaged in substantial business activities in the production and manufacturing sectors; and (ii) are lawfully operating in Vietnam.

D.    Three years after entry into force of this Agreement, U.S. nationals and companies shall be allowed to enter into joint ventures with Vietnamese counterparts to engage in trading activities in all products, subject to restrictions listed in Annexes B, C and D.  Equity contributed by U.S. companies shall not exceed 49% of such joint ventures' legal capital.  Three years thereafter, this limitation on U.S. ownership shall be 51%.

E.      Seven years after entry into force of this Agreement, U.S. companies shall be allowed to establish 100% U.S.- owned companies to engage in trading activities in all products, subject to restrictions listed in Annexes B, C and D.

8.      If a Party has not acceded to the International Convention on the Harmonized Commodity Description and Coding System, it will undertake every reasonable effort to do so as soon as possible, but no later than one year after the entry into force of this Agreement.

### Article 3
### General Obligations with Respect to Trade

1.      The Parties shall seek to achieve a satisfactory balance of market access opportunities through the satisfactory reciprocation of reductions in tariffs and nontariff barriers to trade in goods resulting from multilateral negotiations.

2.      The Parties shall except as specifically provided in Annexes B and C to this Agreement, eliminate all import and export restrictions, quotas, licensing requirements, and controls for all product and service categories, other than those that would be permitted by GATT 1994.

3.      The Parties shall, within two years of the entry into force of this Agreement, limit all fees and charges of whatever character (other than import and export duties and other taxes within the purview of Article 2 of this Chapter) imposed on or in connection with importation or exportation to an amount approximate to the cost of services rendered, and ensure that such fees and charges do not represent an indirect protection to domestic products or a taxation of imports or exports for fiscal purposes;

4.      The Parties shall, within two years of the entry into force of this Agreement, adopt a system of customs valuation based on the transaction value of the imported merchandise on which duty is assessed, or of like merchandise, rather than on the value of merchandise of national origin or on arbitrary or fictitious values, with the transaction value being the price actually paid or payable for the goods when sold for export to the country of importation in accordance with the standards established in the Agreement on Implementation of Article VII of the GATT 1994; and

5.      Within two years of entry into force of this Agreement, the Parties shall ensure that the fees and charges referred to in paragraph 3 of this Article and the customs valuation system referred to in paragraph 4 of this Article are imposed or implemented uniformly and consistently throughout each Party's customs territory.

6.      In addition to the obligations set forth in Article 1, Vietnam shall provide tariff treatment to products originating in the customs territory of the United States  in accordance with the provisions of Annex E.

7.      Neither Party shall require its nationals or companies to engage in barter or countertrade transactions with nationals or companies of the other Party. Nevertheless, where nationals or companies decide to resort to barter or countertrade operations, the Parties may furnish them information to facilitate the transaction and assist them as they would with respect to other export and import operations.

8.      The United States shall consider Vietnam's eligibility for the Generalized System of Preferences.


## Article 4
## Expansion and Promotion of Trade

Each Party shall encourage and facilitate the holding of trade promotional events such as trade fairs, exhibitions, missions and seminars in its territory and in the territory of the other Party. Similarly, each Party shall encourage and facilitate the participation of its respective nationals and companies in such events.  Subject to the laws in force within their respective territories, the Parties agree to allow the import and re-export on a duty free basis of all articles for use in such events, provided that such articles are not sold or otherwise transferred.


## Article 5
## Government Commercial Offices

1.      Subject to its laws and regulations governing foreign missions, each Party shall allow government commercial offices of the other Party to hire host-country nationals and, subject to immigration laws and procedures, third-country nationals.

2.      Each Party shall ensure unhindered access of host-country nationals to government commercial offices of the other Party.

3.      Each Party shall allow the participation of its nationals and companies in the commercial activities of the other Party's government commercial offices.

4.      Each Party shall allow access by government commercial office personnel of the other Party to the relevant host-country officials, and to representatives of nationals and companies of the host Party.

-6-

**Article 6**
**Emergency Action on Imports**

1.   The Parties agree to consult promptly at the request of either Party whenever either actual or prospective imports of products originating in the territory of the other Party cause or threaten to cause or significantly contribute to market disruption.  Market disruption exists within a domestic industry whenever imports of an article, like or directly competitive with an article produced by such domestic industry, are increasing rapidly, either absolutely or relatively, so as to be a significant cause of material injury, or threat thereof, to such domestic industry.   The consultations provided in this paragraph shall have the objectives of (a) presenting and examining the factors relating to such imports that may be causing or threatening to cause or significantly contributing to market disruption, and (b) finding means of preventing or remedying such market disruption.  Such consultations shall be concluded within sixty days from the date of the request for such consultations, unless the Parties agree otherwise.

2.   Unless a different solution is mutually agreed upon during the consultations, the importing Party may (a) impose quantitative import limitations, tariff measures or any other restrictions or measures it deems appropriate, and for such period of time it deems necessary, to prevent or remedy threatened or actual market disruption, and (b) take appropriate measures to ensure that imports from the territory of the other Party comply with such quantitative limitations or other restrictions introduced in connection with market disruption.  In this event, the other Party shall be free to deviate from its obligations under this Agreement with respect to substantially equivalent trade.

3.   Where in the judgment of the importing Party, emergency action is necessary to prevent or remedy such market disruption, the importing Party may take such action at any time without prior notice or consultation, on the condition that consultations shall be effected immediately after taking such action.

4.   The Parties acknowledge that the elaboration of the market disruption safeguard provisions in this Article is without prejudice to the right of either Party to apply its laws and regulations applicable to trade in textiles and textile products, and its laws and regulations applicable to unfair trade, including antidumping and countervailing duty laws.

**Article 7**
**Commercial Disputes**

For the purposes of Chapter I of this Agreement:

1.   Nationals and companies of either Party shall be accorded national treatment with respect to access to all competent courts and administrative bodies in the territory of the other Party, as plaintiffs, defendants or otherwise.  They shall not be entitled to claim or enjoy immunity from suit or execution of judgment, proceedings for the recognition and enforcement of arbitral awards, or other liability in the territory of the other Party with

-8-

respect to commercial transactions.  They also shall not claim or enjoy immunities from taxation with respect to commercial transactions, except as may be provided in other bilateral agreements.

2.      The Parties encourage the adoption of arbitration for the settlement of disputes arising out of commercial transactions concluded between nationals or companies of the United States of America and nationals or companies of the Socialist Republic of Vietnam.  Such arbitration may be provided for by agreements in contracts between such nationals and companies, or in separate written agreements between them.

3.      The parties to such transactions may provide for arbitration under any internationally recognized arbitration rules, including the UNCITRAL Rules of December 15, 1976, and any modifications thereto, in which case the parties should designate an Appointing Authority under said rules in a country other than the United States of America or the Socialist Republic of Vietnam.

4.      The parties to the dispute, unless otherwise agreed between them, should specify as the place of arbitration a country other than the United States of America or the Socialist Republic of Vietnam, that is a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958.

5.      Nothing in this Article shall be construed to prevent, and the Parties shall not prohibit, the parties from agreeing upon any other form of arbitration or on the law to be applied in such arbitration, or other form of dispute settlement which they mutually prefer and agree best suits their particular needs.

6.      Each Party shall ensure that an effective means exists within its territory for the recognition and enforcement of arbitral awards.

### Article 8
### State Trading

1.      The parties may establish or maintain a state enterprise, or grant to any enterprise, formally or in effect, exclusive or special privileges, to import and export the products listed in Annex C, provided however, that any such enterprise shall, in its purchases or sales involving either imports or exports, act in a manner consistent with the general principles of non-discriminatory treatment prescribed in this Agreement for governmental measures affecting imports or exports by private traders.

2.      The provisions of paragraph 1 of this Article shall be understood to require that such enterprises shall, having due regard to the other provisions of this Agreement, make any such purchases or sales solely in accordance with commercial considerations, including

price, quality, availability, marketability, transportation and other conditions of purchase or sale, and shall afford the enterprises of the other Party adequate opportunity, in accordance with customary business practice, to compete for participation in such purchases or sales.

3.       The provisions of paragraph 1 of this Article shall not apply to imports of products for immediate or ultimate consumption in government use and not otherwise for resale or use in the production of goods for sale.  With respect to such imports, each Party shall accord to the trade of the other Party fair and equitable treatment.

**Article 9**
**Definitions**

As used in this Chapter, the terms set forth below shall have the following meaning:

1.       "company," means any entity constituted or organized under applicable law, whether or not for profit, and whether privately or governmentally owned or controlled, and includes a corporation, trust, partnership, sole proprietorship, branch, joint venture, association, or other organization.

2.       "enterprise," means a company.

3.       "national," means a natural person who is a national of a Party under its applicable law.

4.       "commercial dispute," means a dispute between parties to a commercial transaction which arises out of that transaction.

5.       "trading rights," means the right to engage in import or export activities.

**ANNEX A**

**VIETNAM**

**Exceptions on National Treatment**

The provisions of Chapter I, Article 2 are not applied to the following:

1.      Special consumption tax on vehicles under 12 seats, inputs of production of cigarettes, and cigars.

2.      Supplemental tax on fuels, metals and fertilizers.

The aforementioned exceptions in this Annex (paragraphs 1 and 2) will be eliminated within 3 years from the entry into force of this Agreement.

ANNEX B

VIETNAM

**\*Note:   Phase-out period in Annex B shall be calculated from date of entry into force of this Agreement**

**Annex B1 - Import Quantitative Restrictions - Agricultural Products**

| HS Number | Description | Phase-Out Period (yrs.)* |
|---|---|---|
| | | |
| 0201 | Meat of bovine animals, fresh/chilled | 4 |
| | | |
| 0207 | Poultry meat & offals.- frsh/chilled/fz | 5 |
| | | |
| 0401 | Milk - fresh milk... | 4 |
| | | |
| 0402 | Condensed milk or cream | 4 |
| | | |
| 0403 | Buttermilk, yogurt, kephir and other fermented or acidified milk | 4 |
| | | |
| 0404 | Whey, concentrated or containing added sugar... | 4 |
| | | |
| 0805 | Citrus fruits: fresh or dried | 4 |
| | | |
| 1005.10.90 | - Other (corn) | 4 |
| 1005.90.00 | - Other | 4 |
| 1103.13.00 | - Of corn | 4 |
| 1104.19.10 | - Corn | 4 |
| 1104.23.00 | - Of corn | 4 |
| | | |
| 1507 | Soybean oil and its fractions, whether or not refined, but not chemically modified | |
| 1507.90.10 | - refined | 4 |
| 1507.90.90 | - other | 4 |

| | | |
|---|---|---|
| 1508 | Ground nut oil and its fractions, whether or not refined, but not chemically modified | |
| 1508.90.10 | - refined | 4 |
| 1508.90.90 | - other | 4 |
| | | |
| 1509 | Olive oil and its fractions, whether or not refined, but not chemically modified | |
| 1509.90.10 | - refined | 4 |
| 1509.90. 90 | - other | 4 |
| | | |
| 1510.00 | Other oils and their fractions, obtained solely from olives, whether or not refined.. | |
| 1510.00.91 | - refined | 4 |
| 1510.00.99 | - other | 4 |
| | | |
| 1511 | Palm oil and its fractions, whether or not refined, but not chemically modified | |
| 1511.90.90 | - other | 4 |
| | | |
| 1512 | Sunflower, safflower or cotton seed oil and fractions thereof, whether or not refined but not chemically modified | |
| 1512.19.10 | - refined | 4 |
| 1512.19.90 | - other | 4 |
| 1512.29.10 | - refined | 4 |
| 1512.29.90 | - other | 4 |
| | | |
| 1513 | Coconut (copra), palm kernel or babassu oil and fractions thereof, whether or not refined but not chemically modified | |
| 1513.19.10 | - refined | 4 |
| 1513.19.90 | - other | 4 |
| 1513.29.10 | - refined | 4 |
| 1513.29.90 | - other | 4 |
| | | |
| 1514 | Rape, colza or mustard oil and ... | |
| 1514.90.10 | - refined | 4 |
| 1514.90.90 | - other | 4 |

| | | |
|---|---|---|
| 1515 | Other fixed vegetable fats and oils... | |
| 1515.19.00 | - other | 4 |
| 1515.29.90 | - other | 4 |
| 1515.30.90 | - other | 4 |
| 1515.40.90 | - other | 4 |
| 1515.50.90 | - other | 4 |
| 1515.60.90 | - other | 4 |
| 1515.90.12 | - other | 4 |
| 1515.90.99 | - other | 4 |
| | | |
| 1516 | Animal or vegetable fats and oils and their fractions, partly or wholly hydrogenated, inter-esterified... | |
| 1516.20.00 | - vegetable fats and oils and fractions | 4 |
| | | |
| 1601 | Sausages and similar products, of meat, meat offal or blood... | 3 |
| | | |
| 1602 | Other prepared and preserved meat... | 3 |
| | | |
| 1701.11.00 | - cane-sugar | 10 |
| 1701.12.00 | - beet sugar | 10 |
| 1701.91.00 | - containing added flavoring or coloring matter | 10 |
| 1701.99.10 | - white sugar | 10 |
| 1701.99.90 | - other | 10 |
| | | |
| 2006 | Vegetables, fruit, nuts, fruit and other parts of plants, pr/pr by sugar | 5 |
| | | |
| 2007 | Jams, fruit jellies, marmalades, fruit or nut puree... | 3 |
| | | |
| 2009 | Fruit juices (including grape must) and vegetable juices... | |
| | - orange juices | |
| 2009.11.00 | - frozen | 5 |
| 2009.19.00 | - other | 5 |
| 2009.20.00 | - grapefruit juice | 3 |
| 2009.30.00 | - juice of any other single citrus fruit | 5 |

| 2009.40.00 | - pineapple juice | 5 |
|---|---|---|
| 2009.50.00 | - tomatoes juice | 5 |
| 2009.60.00 | - grape juice (including grape must) | 3 |
| 2009.70.00 | - apple juice | 3 |
| 2009.80.00 | - juice of any other single fruit/vegetable | 5 |
| 2009.90.00 | - mixtures of juices | 5 |
| | | |
| 2101 | Extracts, essences and concentrates, of coffee, tea... | |
| 2101.11.10 | - Instant coffee | 4 |
| 2101.11.90 | - Other | 4 |
| 2101.12.00 | - Preparations with a basic of extracts, essences or concentrates or with a basic of coffee | 4 |
| | | |
| 2204 | Wine or fresh grapes, including fortified wines; grape must other than that of heading No. 2009 | 5 |
| | | |
| 2205 | Vermouth and other wine of fresh grapes flavored with plants or aromatics substances | 5 |
| | | |
| 2206 | Other fermented beverages | 5 |
| | | |
| 2207 | Undenatured ethyl alcohol > 80% | 5 |
| | | |
| 2208 | Undenatured ethyl alcohol < 80% | 5 |
| | | |
| 2309 | Preparations of a kind used in animal feeding | |
| 2309.90.10 | - Shrimp food | 4 |
| 2309.90.90 | - Other | 4 |
| | | |

**Annex B1 - Import Quantitative Restrictions - Industrial Products**

| HS Number | Description | Phase-Out Period (yrs) * |
|---|---|---|
| 25231000 | --Cement clinkers | 6 |
| 25232100 | --White portland cement whthr or nt art colored | 6 |
| 25232910 | --Portland cement except white portland cement | 6 |
| 25232920 | --Portland cement except white portland cement | 6 |
| 27072000 | --Toluene | 7 |
| 27101100 | --Aviation spirit | 7 |
| 27101200 | --White spirit (for producing paints) | 7 |
| 27101900 | --Other petroleum oils and oil preparations | 7 |
| 27102000 | --Diesel | 7 |
| 27103000 | --Mazout | 7 |
| 27104000 | --Other light oils & preparation | 7 |
| 27105000 | --Other medium oils & preparations | 7 |
| 27106000 | --Other medium oils &preparations | 7 |
| 27107000 | --Other medium oils & preparations | 7 |
| 27109000 | --Petroleum oils and oil preparations, other | 7 |
| 27111100 | --Natural gas, liquified | 7 |
| 27111200 | --Propane, liquefied | 7 |
| 27111300 | --Butanes, liquefied | 7 |
| 27111400 | --Ethylene, propylene, butylene and butadiene liquified | 7 |
| 27111900 | --Petroleum gases etc., liquified, nesoi | 7 |
| 28061000 | --Hydrogen chloride (hydrochloric acid) | 3 |
| 28070000 | --Sulfuric acid; oleum | 3 |
| 28092010 | --Phosphoric acid and polyphosphoric acids | 3 |
| 28141000 | --Anhydrous ammonia | 3 |
| 28142000 | --Ammonia in aqueous solution | 3 |
| 28151100 | --Sodium hydroxide (caustic soda), solid | 3 |
| 28151200 | --Sodium hydroxide in aqueous solution | 3 |
| 31051000 | --Fertilizers... in packages of a gross weight =<10kg | 5 |
| 31052000 | --Mineral or chemical fertilizers with nitrogen, phosphorus and potassium | 5 |
| 31053000 | --Diammonium hydrogenorthophosphate (diammonium phosphate) | 5 |
| 31054000 | --Ammonium dihydrogenorthophosphate (monoammonium phosphate) | 5 |
| 31055100 | --Mineral or chemical fertilizers containing nitrates and phosphates | 5 |
| 31055900 | --Mineral or chemical fertilizers with nitrogen and phosphorus, nes | 5 |
| 31056000 | --Mineral or chemical fertilizers with phosphorus and potassium, nes | 5 |

| | | |
|---|---|---|
| 31059000 | --Other fertilizers, nes | 5 |
| 32081020 | -- Other varnishes | 3 |
| 32081040 | -- Base paints | 3 |
| 32081050 | -- Other, including enamels | 3 |
| 32081090 | -- Other | 3 |
| 32082020 | -- Other varnishes | 3 |
| 32082040 | -- Base paint | 3 |
| 32082050 | -- Other, including enamels | 3 |
| 32082090 | -- Other | 3 |
| 32089020 | -- Other varnishes | 3 |
| 32089040 | -- Base paints | 3 |
| 32089050 | -- Other, including enamels | 3 |
| 32089090 | -- Other | 3 |
| 32091020 | -- Other varnishes | 3 |
| 32091040 | -- Base paints | 3 |
| 32091050 | -- Other, including enamels | 3 |
| 32091090 | -- Other | 3 |
| 32099020 | -- Other varnishes | 3 |
| 32099040 | -- Base paints | 3 |
| 32099050 | -- Other, including enamels | 3 |
| 32099090 | -- Other | 3 |
| 32100020 | -- Other varnishes | 3 |
| 32100040 | -- Base paints | 3 |
| 32100050 | -- Other, including enamels | 3 |
| 32100060 | -- Other | 3 |
| 38122000 | --Compound plasticizers for rubber or plastics | 3 |
| 38123010 | --Antioxidizing prep & oth compnd,for rubber/plastic | 3 |
| 40111000 | --New pneumatic tires of rubber, for motor cars | 4 |
| 40112010 | --New pneumatic tires of rubber, for buses or trucks | 4 |
| 40112090 | --New pneumatic tires of rubber, for buses or trucks | 4 |
| 40114000 | --New pneumatic tires, of rubber, used on motorcycle | 7 |
| 40115000 | --New pneumatic tires, of rubber, used on bicycles | 7 |
| 40119110 | --Tires with a width of 450 mm | 7 |
| 40119190 | -- Other | 7 |
| 40119910 | --Tires with a width of 450 mm | 7 |
| 40119990 | -- Other | 7 |
| 40131010 | --Inner tubes of rubber for mot cars, buses & trucks | 7 |

| | | |
|---|---|---|
| 40131090 | --Inner tubes of rubber for mot cars, buses & trucks | 7 |
| 40132000 | --Inner tubes, of rubber, of a kind used on bicycles | 7 |
| 40139010 | --Inner tubes, of rubber, of a kind used on aircraft | 7 |
| 40139020 | --Inner tubes, of rubber, of a kind used on motorcycles | 7 |
| 40139091 | --Inner tubes, of rubber, for tires with a width of 450 mm | 7 |
| 40139099 | --Inner tubes, of rubber, for tires with a width over 450 mm | 7 |
| 48010000 | --Newsprint, in rolls or sheets | 5 |
| 48021000 | --Handmade paper and paperboard | 5 |
| 48025110 | --Paper, nov 10% fiber by mech pr, un40g/m2 uc | 5 |
| 48025190 | --Paper nesoi, nov 10% fiber by mech pr, un40g/m2 uc | 5 |
| 48025210 | --Paper, nov 10% fib mech pr, 40g/m2nov150g/m2 | 5 |
| 48025290 | --Paper nesoi, nov 10% fib mech pr, 40g/m2nov150g/m2 | 5 |
| 48025300 | --Paper nesoi, nov 10% fiber by mech pr, ov150g/m2 u | 5 |
| 48026010 | --Paper, over 10% (wt) fiber by mechan proc uc | 5 |
| 48026090 | -- Other | 5 |
| 48041100 | --Kraftliner, uncoated unbleached in rolls or sheets | 4 |
| 48041900 | -- Other | 4 |
| 48044190 | --Kraft paper nesoi, ov 150 g/m2 un 225 g/m2 uc unbl | 4 |
| 48044200 | --Kraft paper nesoi, ov150g/m2und225g/m2, bl, 95% wf uc | 4 |
| 48044900 | --Kraft paper/pprbrd unctd blchd nesoi 151-224g/m2 | 4 |
| 48045190 | -- Other | 4 |
| 48045200 | --Kraft pr nesoi, not un 225g/m2, bl, 95% w fib chem | 4 |
| 48045900 | -- Other | 4 |
| 48079000 | -- Other | 4 |
| 48101110 | --Paper, writ etc, nov 10% mech pr fib nov150g/m2 ct | 5 |
| 48101210 | --Paper/pbrd writing etc nesoi clay ctd ov 150g/m2 etc | 5 |
| 48102110 | --Paper, light-wgh coated writing etc over 10% mech | 5 |
| 48102910 | --Paper/pbrd ex lit-wgh writing etc clay ctd ov 10% mec | 5 |
| 48202000 | --Exercise books, of paper or paperboard | 5 |
| 48235110 | --Paper/pbrd for graphics nesoi prnt/embssd etc cut sz | 5 |
| 48235910 | --Paper & paperbd cut to size etc, for photocopy | 5 |
| 50071000 | --Woven fabrics of noil silk | 5 |
| 50072000 | --Wov fab ov 85% silk or silk waste except noil silk | 5 |
| 50079000 | --Woven fabrics of silk or silk waste, nesoi | 5 |
| 68101910 | --Tiles, flagstones etc, cement etc or artif stone | 3 |
| 69049000 | -- Other | 3 |
| 69059000 | -- Other | 3 |

-B7-

| | |
|---|---|
| 69071000 | --Unglzd ceramic tiles, cubes etc, sides ls thn 7 cm | 3 |
| 69079000 | -- Other | 3 |
| 69081000 | --Glazed ceramic tiles cubes etc fttng in sq un 7cm | 3 |
| 69089000 | -- Other | 3 |
| 69101000 | --Ceramic sanitary fixtures of porcelain or china | 3 |
| 69109000 | --Ceramic sanitary fixtures oth thn of porcln/china | 3 |
| 70031290 | --Nonwrd shts cast/rld glass, colrd,opac,flshd,layrd | 6 |
| 70031990 | --Cast or rolled glass in nonwired sheets, nesoi | 6 |
| 70042090 | --Drawn/blown glass sheets colored opac flash spec layer | 6 |
| 70049090 | --Drawn/blown glass shts w/wo absorb/rfct lyr n oth wrkd | 6 |
| 70052190 | --Nonwrd glass clrd opc flshd or srfc grnd n ab/rf ly | 6 |
| 70052990 | --Nonwired glass nesoi in sheets | 6 |
| 70169000 | --Gls cons art nesoi;ld wndws;mltclr/fmd gls artcls | 6 |
| 72091500 | --Flt-cold-rol irn,noaly,coil,600mm wide,3mm > thick | 6 |
| 72091600 | --Fl-cld-rl irn, nesoi, st,coil,600mm wide,>1mm but <3mm | 6 |
| 72091700 | --Fl-cld-rl irn,st,coil,600mm wd,0.5mmbut n/o 1mm tk | 6 |
| 72091800 | --Flat-cold-rld ir,stl,coils,600mm wide,<0.5mm thick | 6 |
| 72092500 | --Flt-cld-rld ir,st,not coil,600mm,3mm or > thk | 6 |
| 72092600 | --Flt-cld-rld ir,st,not coil,600mm wd, >1mm <3mm thk | 6 |
| 72092700 | --Flt-cld-rld,not coil 600mm w,>0.5mmbut n/o 1mm thk | 6 |
| 72092800 | --Flt-cld-rld ir,nonal,notcoil,600mm wide,>0.5mm thk | 6 |
| 72099000 | --Other | 6 |
| 72103010 | --Flat-rld iron,nonal stl,600mm wide,elec platd zinc | 6 |
| 72103090 | --Other | 6 |
| 7210 4110 | - Of a thickness not more than 1.2 mm | 6 |
| 72104190 | --Other | 6 |
| 72104910 | --Fr ir/nas ctd/pltd w zinc nt elec nt corr 600mm om | 6 |
| 72104990 | -- Other | 6 |
| 72105000 | --Fr ios na 600mm ao w ctd/pltd w cro or cr and cro | 6 |
| 72106110 | --Fr iron/nonalloy steel 600mm ao,pltd/ctd alum-znc | 6 |
| 72106190 | --Other | 6 |
| 72106910 | --Fr iron/nonalloy steel,600mm ao,pltd/ctd othr alum | 6 |
| 72106990 | --Other | 6 |
| 72107000 | --Fr ir/nas 600mm w om, painted, varnished, plastic | 6 |
| 72109000 | --Other | 6 |
| 72111300 | --Fr hs ios na un600mm w hr pl unvrsl mllplte | 6 |
| 72111400 | --Fr hs ios na un600mm w hr pl 4.75mm ao thck | 6 |

| | |
|---|---|
| 72111900 --Oth fr hi-str st un 600mm w npld un4.75mm thck | 6 |
| 72112300 --Flat-hot-rolled iron,nonalystl, <600mm wide, nesoi | 6 |
| 72112900 --Other | 6 |
| 72119000 --Other | 6 |
| 72131010 --Bars and rods irregular coils concrete reinforcing | 6 |
| 72131020 --Bars and rods irregular coils concrete reinforcing | 6 |
| 72132000 --Brs rods hot-rlld irreg coils free-cuttng steel | 6 |
| 72139100 --Bars,rodshot-roll,irnnoal st coil circ,<14mm nesoi | 6 |
| 72139900 --Other | 6 |
| 72141010 --Other bars and rods iron or nonalloy steel, forged | 6 |
| 72141020 --Other | 6 |
| 72142010 --Oth brs rds ios na hot-wrkd, conc reinfrcng | 6 |
| 72142020 --Other | 6 |
| 72143010 --Other bars and rods free-cutting steel, hot-worked | 6 |
| 72143020 --Other | 6 |
| 72149100 --Bars,rods,hot-rolled,-drawn,-ext,rectangular,nesoi | 6 |
| 72149900 --Other | 6 |
| 72151010 --Oth brs and rds free-cttng stl cold-fmd or fnshd | 6 |
| 72151090 --Other | 6 |
| 72155010 --Bars,rods,irn,noal,cold-formed,cold-finished,nesoi | 6 |
| 72155090 --Other | 6 |
| 72159010 --Bars and rods iron or nonalloy steel, nesoi | 6 |
| 72159090 --Other | 6 |
| 72161000 --U-i-h-sections ir/nas hot/wrkd ls thn 80mm high | 6 |
| 72162100 --L sec ios na hot-wkd lss th 80mm high | 6 |
| 72162200 --T sec ios na hot-wkd lss th 80mm high | 6 |
| 72163110 --U sec ios na hot-wkd 80mm or more high | 6 |
| 72163190 --Other | 6 |
| 72163210 --I sec ios na hot-wkd 80mm ao high (standard beams) | 6 |
| 72163290 --Other | 6 |
| 72163310 --H sections irn/nas, hot-wrkd, 80mm hi or more | 6 |
| 72163390 --Other | 6 |
| 72164010 --L or t sections ir/nas hot-wrkd, 80mm hi or more | 6 |
| 72164090 --Other | 6 |
| 72165010 --Oth angls shps sec ios na hot-wkd | 6 |
| 72165090 --Other | 6 |
| 72166100 --Angls shps sec ir/nas nt frthr cld-wrkd frm fr pro | 6 |

| | | |
|---|---|---|
| 72166900 | --Other | 6 |
| 72169100 | --Angls shps sec irn/nas oth cld-wrkd fr fr products | 6 |
| 72169900 | --Other | 6 |
| 72171000 | --Other | 6 |
| 72172000 | -Other | 6 |
| 72173000 | -Other | 6 |
| 72179000 | -Other | 6 |
| 73030000 | --Tubes, pipes and hollow profiles of cast iron | 6 |
| 73043191 | -Oth ios na ps tb hlw pfl smls cir cs cold-wrkd | 6 |
| 73043991 | -Oth ios na ps tb hlw pfl smls cir cs nt cld-wrkd | 6 |
| 73049091 | --Tubes, pipes etc, seamless nesoi, ir nesoi & steel | 6 |
| 73049099 | --Tubes, pipes etc, seamless nesoi, ir nesoi & steel | 6 |
| 73053920 | --Other pipe, ov16in iron or steel, welded nesoi | 6 |
| 73063091 | --Pipe etc nesoi, weld cir cr sect, iron or nonal st | 6 |
| 73069091 | --Pipes etc nesoi, riveted etc, of iron or steel | 6 |
| 73130000 | --Barbed wire and twisted wire for fencing, iron/stl | 6 |
| 73141900 | --Woven products iron or steel, nesoi | 6 |
| 73142000 | --Grill netting fencing wld ir/st wr 3mmcs 100cm2msh | 6 |
| 73143100 | --Oth grll nttng a fncng wldd at intrsct galvnzed st | 2 |
| 73143900 | --Other | 2 |
| 73144100 | --Oth grill, nettg fncg ios ctd/pl w zn nesoi nt wld | 2 |
| 73144200 | --Grill netting fencing, plastic coated ios wr nesoi | 2 |
| 73144900 | --Other | 2 |
| 73145000 | --Expanded metal, iron or steel | 2 |
| ex8407 | --Engines with a capacity not exceeding 30 cv | 7 |
| ex8407 | --Engines with  a capacity exceeding 30 cv but not exceeding 100 cv | 6 |
| ex8408 | --Engines with  a capacity not exceeding 30 cv | 7 |
| ex8408 | --Engines with  a capacity exceeding 30 cv but not exceeding 100 cv | 6 |
| 84145100 | --Table, floor etc fans electric not exceed 125 w | 3 |
| 84145900 | --Other | 3 |
| 87021000 | --Mv trnsp >ten prsns com-igntn intr comb pist(disl) | 5 |
| 87029000 | --Other | 5 |
| 87031010 | --Pass veh for snow; golf carts & similar vehicles | 5 |
| 87031020 | --Pass veh for snow; golf carts & similar vehicles | 5 |
| 87032110 | --Pass mtr veh, spark ign eng, not ov 1,000 cc | 5 |
| 87032120 | --Pass mtr veh, spark ign eng, not ov 1,000 cc | 5 |
| 87032210 | --Pass mtr veh,spark ign eng, >1000cc but =<1500cc | 5 |

| | | |
|---|---|---|
| 87032220 | --Pass mtr veh,spark ign eng, >1000cc but =<1500cc | 5 |
| 87032310 | --Pass veh spk-ig int com rcpr p eng >1500 nov 3m cc | 5 |
| 87032320 | --Pass veh spk-ig int com rcpr p eng >1500 nov 3m cc | 5 |
| 87032410 | --Pass veh spk-ig int com rcpr p eng > 3000 cc | 5 |
| 87032420 | --Pass veh spk-ig int com rcpr p eng > 3000 cc | 5 |
| 87033110 | --Pass mtr veh, diesel eng, not ov 1500 cc | 5 |
| 87033120 | --Pass mtr veh, diesel eng, not ov 1500 cc | 5 |
| 87033210 | --Pass veh com-ig int com eng > 1500 nov 2500 cc | 5 |
| 87033220 | --Pass veh com-ig int com eng >1500 nov 2500 cc | 5 |
| 87033310 | --Pass veh com-ig int com eng > 2500 cc | 5 |
| 87033320 | --Pass veh com-ig int com eng > 2500 cc | 5 |
| 87039010 | --Passenger motor vehicles, nesoi | 5 |
| 87039020 | --Passenger motor vehicles, nesoi | 5 |
| 87042100 | --Trucks, nesoi, diesel eng, gvw 5 metric tons & und | 5 |
| 87043100 | --Mtr veh trans gds spk ig in c p eng, gvw nov 5 mtn | 5 |
| 87049010 | --Mtr veh of gross weight not > 5 tons | 5 |
| ex8711 | --Motorcycles with an engine capacity of less than 175cv | 5 |
| 87120010 | --Bicycles & oth cycles (inc del tricycle) no motor | 5 |
| 87120020 | --Bicycles & oth cycles (inc del tricycle) no motor | 5 |
| 87120090 | --Bicycles & oth cycles (inc del tricycle) no motor | 5 |
| 87149100 | --Frames and forks, and prts for bicycles etc. | 3 |
| 87149200 | --Wheel rims and spokes for bicycles etc. | 3 |
| 87149300 | --Hubs,other than coster brakn hubs,hb brks,spk,whls | 3 |
| 87149400 | --Brakes, incl  coaster brkng hubs,hub brks,prts,nes | 3 |
| 87149500 | --Saddles for bicycles etc. | 3 |
| 87149600 | --Pedals and crank-gear, parts of bicycles etc. | 3 |
| 87149900 | --Other | 3 |
| 89011090 | -- other (cruise ships, etc, less than 5,000 dwt) | 5 |
| 89012090 | -- other (tankers, less than 5,000 dwt) | 5 |
| 89013090 | -- other (refrig vessels, less than 5,000 dwt) | 5 |
| 89019090 | --other (less than 5,000dwt) | 5 |
| 89020010 | --Fishing vessels;factory ships & shps,ves, nesoi | 5 |
| 89020090 | --Other | 5 |

## Annex B2: Export Quantitative Restrictions

| HS Number | Description | Phase-Out Period * |
|-----------|-------------|--------------------|
| 10063000 | Semi- milled or wholly milled rice | Unbound |
| 10064000 | Broken rice | Unbound |

### Annex B3 - Prohibited Imports

1.      Cigarettes (except for those as personal effects in prescribed quantity).

2.      Used consumer goods (except for transferred assets including goods to service the personal requirements of individuals with diplomatic status of foreign countries, international organizations and personal effects in prescribed quantity).

1.      Cars with right hand drive (including those in unassembled form and those with steering wheel modified prior to importation into Vietnam.  As far as self-propelled special-purpose vehicles with right hand drive operating in narrow fields, such as cranes, trench and canal digging machines, garbage trucks, road sweepers, road construction trucks, airport passenger buses, and forklifts are concerned, importation is permitted and the Minister of Trade shall approve when there is demand.

2.      Used spare parts of automobiles of all kinds, motorbikes and motor tricycles - including chassis mounted with used automobile engines of all kinds.

3.      Used internal combustion engines with capacity of less than 30CV.

4.      Motorcycles, scooters and motor tricycles with cylinder of 175 cc and higher.  In case of importation for defense, security and professional sports, to be subject to Prime Minister's approval.

5.      Other goods that may be within the scope of an exception set forth in Chapter I or Chapter VII of this Agreement.

### Annex B4 - Export Prohibitions

1.      Logs, sawn and peeled timber; firewood, charcoal from wood or firewood; wood and forest products and semi-products which are subject to export prohibitions provided for in Decision 65/1998/QD-TTg dated 24 March 1998 by Prime Minister of Vietnam.

-B12-

2.      Other goods that may be within the scope of an exception set forth in Chapter I or Chapter VII of this Agreement.

# ANNEX C

# VIETNAM

*Note:*
*U = Unbound*
**\* Phase-out period in Annex C shall be calculated from the date of entry into force of this Agreement**

### Annex C1- Imports Subject to State Trading and Phase-Out Schedule

| HS Number | Description | Phase Out Period (yrs.)\* |
|---|---|---|
| 27101100 | Aviation spirit | U |
| 27101200 | White spirit (for producing paints) | U |
| 27101900 | Other petroleum oils and oil preparations | U |
| 27102000 | Diesel | U |
| 27103000 | Mazut | U |
| 27104000 | Light oils | U |
| 27105000 | Medium oils | U |
| 27106000 | Naptha | U |
| 27107000 | Condensate | U |
| 27109000 | Petroleum oils, other | U |
| 3102 | Mineral or chemical fertilizers, nitrogenous | 5 |
| 3103 | Mineral or chemical fertilizers, phosphatic | 5 |
| 3104 | Mineral or chemical fertilizers, potassic | 5 |
| 3105 | Mineral or chemical fertilizers, other | 5 |
| 3601 | Propellant powders | U |
| 3602 | Prepared explosives other than propellent powders | U |
| 3603 | Safety fuses; detonating fuse; percussion caps etc | U |
| 3706 | Motion-picture film, exposed and developed | U |
| 4901 | Books, brochures & similar printed matter | U |

| 4902 | Newspapers, journals & periodicals | U |
|---|---|---|
| 4903 | Children's picture, drawing or coloring books | U |
| 4907 | Unused postage, check forms, banknotes, stock, etc | U |
| 4909 | Printed or illust post cards, greeting cards, etc. | U |
| 4910 | Calendars, calendar blocks of any kind, printed | U |
| 4911 | Printed matter nesoi, incl print pictures & photos | U |
| 8442 | Mach etc nesoi for typeset, making pr plates etc | U |
| 8443 | Print mach incl ink-jet mach ancil t prnt pt nesoi | U |
| 8524 | Records, tapes & other recorded sound media etc | U |
| 8525 | Trans appar for radiotele etc; tv camera & rec | U |
| 8526 | Radar apparatus, radio navig aid & remote cont app | U |
| ex85291000 | Only satellite aerials for broadcasting | U |
| ex85299000 | Only aerials for equipment in 8525 adn 8526 | U |
| 9704 | Postage or revenue stamps, firstday covers | U |

**Annex C2- Exports Subject to State Trading and Phase-Out Schedule**

| HS Number | Description | Phase-Out Period * |
|---|---|---|
| 10063000 | Semi-milled or wholly-milled rice | U |
| 10064000 | Broken rice | U |
| 27090010 | Petroleum oils, crude | U |
| 27090090 | Petroleum oils, other | U |
| 27112100 | Natural gas | U |
| 27112900 | Petroleum gases, other | U |
| 7102 | Diamonds | U |
| 7103 | Precious stones | U |
| 7104 | Synthetic precious stones | U |
| 7105 | Dust or powder of precious stones | U |
| 7106 | Silver | U |
| 7108 | Gold | U |

# ANNEX D

# VIETNAM

### Annex D1- Phase-out Periods for Restrictions on Import Trading Rights and Distribution Rights - Agricultural Products

<u>NOTE</u>:
0* =   *No phase-out period*
U =     *Unbound*

*\* - For purposes of Annex D1, phase-out periods for Import Trading Rights shall begin on the date on which joint ventures are first permitted under Article 2.7.D of Chapter I of this Agreement.*
*\*\* - For purposes of Annex D1, phase-out periods for Distribution Rights shall begin on the date on which joint ventures are first permitted under Annex G, section IV (Distribution Services) of this Agreement.*

| HS Number | Description | Import Trading Rights - Phase-out Period* (yrs.) | Distribution Rights - Phase-out Period** (yrs.) |
|---|---|---|---|
| | | | |
| 0102 | Live bovine animals | U | U |
| 0103 | Live swine | U | U |
| 0105 | Live Poultry (not more than 185g) | U | U |
| 0106 | Other live animals | U | U |
| | | | |
| 0201 | Meat of bovine animals, fresh/chilled | 5 | 5 |
| 0202 | Meat of bovine animals, frozen | 3 | 5 |
| 0203 | Meat of Swine - frsh/chilled/frzn | 3 | 5 |
| 0206 | Edible offals bovines -frsh/chilled/fz | 3 | 5 |
| 0207 | Poultry meat & offals.- frsh/chilled/fz | 5 | 5 |
| 0209 | Unrendered pig fat, free of lean meat and poultry meat... | 3 | 5 |
| 0210 | Meat and edible meat offal salted.... | 3 | 5 |

-D1-

| | | | |
|---|---|---|---|
| 0401 | Milk - fresh milk... | 3 | 5 |
| 0402 | Condensed Milk or Cream | 5 | 5 |
| 0403 | Buttermilk, yogurt, keohir and other fermented or acidified milk | 5 | 5 |
| 0404 | Whey, concentrated or containing added sugar... | 3 | 5 |
| 0805 | Citrus Fruits: fresh or dried | 5 | 5 |
| 1005 | Corn | 3 | 5 |
| 1006 | Rice | U | U |
| 1101 | Wheat or meslin flour | 5 | U |
| 1507 | Soybean oil and its fractions.... | 3 | 5 |
| 1508 | Ground nut oil and its fractions.... | 5 | 5 |
| 1511 | Palm oil and its fractions.... | 3 | 5 |
| 1513 | Coconut (copra), palm kernel or babassu oil and fractions ..... | 5 | 5 |
| 1601 | Sausages and similar products, of meat, meat offal or blood... | 3 | 5 |
| 1602 | Other prepared and preserved meat... | 3 | 5 |
| 1701 | Cane or beet sugar and chemically pure sucrose, in solid form | 6 | U |
| 2006 | Vegetables, fruit, nuts, fruit and other parts of | 5 | 5 |

| | | | |
|---|---|---|---|
| | plants, pr/pr by sugar | | |
| | | | |
| 2007 | Jams, fruit jellies, marmalades, fruit or nut puree... | 3 | 5 |
| | | | |
| 2009 | Fruit juices (including grape must) and vegetable juices... | 5 | 5 |
| | | | |
| 2101 | Extracts, essences and concentrates, of coffee, tea... | 3 | 5 |
| | | | |
| 2203 | Beer made from malt | 5 | U |
| | | | |
| 2204 | Wine or fresh grapes, including fortified wines; grape must other than that of heading No. 2009 | 5 | U |
| | | | |
| 2205 | Vermouth and other wine of fresh grapes flavored with plants ...... | 5 | U |
| | | | |
| 2206 | Other fermented beverages | 5 | U |
| | | | |
| 2207 | Undenatured ethyl alcohol > 80% | 5 | U |
| | | | |
| 2208 | Undenatured ethyl alcohol < 80% | 5 | U |
| | | | |
| 2302 | Brans, and other residues whether in the form of pellets.... | 0* | 5 |
| | | | |
| 2303 | Residues of starch manufacture and similar residues... | 0* | 3 |
| | | | |
| 2309 | Preparations of a kind used in animal feeding | 4 | 5 |
| | | | |
| 2401 | Unmanufactured tobacco; tobacco refuse | U | U |
| 2402 | Cigars, cheroots, cigarillos and cigarettes | U | U |
| 2403 | Other manufactured tobacco and manufactured tobacco substitutes | U | U |

**Annex D1- Phase-out Periods for Restrictions on
Import Trading Rights and Distribution Rights -
Industrial Products**

*Notes:*
*0= No phase-out period*
*U= Unbound*
*C= Subject to state trading, Annex C*
*G= Subject to services commitment in Annex G on audio-visual services*

*\* - For purposes of Annex D1, phase-out periods for Import Trading Rights shall begin on the date on which joint ventures are first permitted under Article 2.7.D of Chapter I of this Agreement.*
*\*\* - For purposes of Annex D1, phase-out periods for Distribution Rights shall begin on the date on which joint ventures are first permitted under Annex G, section IV (Distribution Services) of this Agreement.*

| HS Number | Description | Import Trading rights - Phase-out Period* (yrs.) | Distribution rights - Phase-out Period** (yrs.) |
|---|---|---|---|
| 2523 | Portland cement, aluminous cement, slag cement etc | 5 | 7 |
| 2709 | Crude oil from petroleum and bituminous minerals | 5 | U |
| 2710 | Oil (not crude) from petrol & bitum mineral etc. | 7 | U |
| 2711 | Petroleum gases & other gaseous hydrocarbons | 6 | U |
| 2802 | Sulfur, sublimed or precipitated; collodial sulfur | 3 | 5 |
| 2804 | Hydrogen, rare gases and other nonmetals | 2 | 5 |
| 2805 | Alkali metals etc; rare-earth metals etc; mercury | 2 | 5 |
| 2806 | Hydrogen chloride; chlorosulfuric acid | 5 | 5 |
| 2807 | Sulfuric acid; oleum | 5 | 5 |
| 2808 | Nitric acid, sulfonitric acids | 5 | 5 |
| 2809 | Diphosphorus pentaoxide; phosphoric acid etc | 3 | 5 |
| 2810 | Oxides of boron; boric acids | 3 | 5 |
| 2813 | Sulfides of nonmetals; commercial phosp trisulfide | 3 | 5 |
| 2814 | Ammonia, anhydrous or in aqueous solution | 3 | 5 |

| | | | |
|---|---|---|---|
| 2815 | Sodium hydrox; potass hydrox; sod or potass perox | 3 | 5 |
| 2817 | Zinc oxide and zinc peroxide | 3 | 5 |
| 2818 | Artfl corundum w/nt chem defnd alum oxid/hydroxide | 3 | 5 |
| 2819 | Chromium oxides and hydroxides | 3 | 5 |
| 2820 | Manganese oxides | 3 | 5 |
| 2821 | Iron oxides & hydroxides; earth colors nun 70% ir | 3 | 5 |
| 2823 | Titanium oxides | 3 | 5 |
| 2824 | Lead oxides; red lead and orange lead | 3 | 0 |
| 2829 | Chlorates etc; bromates etc; iodates etc. | 3 | 0 |
| 2830 | Sulfides; polysulfides | 3 | 5 |
| 2833 | Sulfates; alums; peroxosulfates (persulfates) | 3 | 5 |
| 2834 | Nitrites; nitrates | 3 | 5 |
| 2835 | Phosphinates, phosphonates, phosphates & polyphosp | 3 | 5 |
| 2836 | Carbonates; peroxocarbonates; comm amm carbonate | 3 | 5 |
| 2840 | Borates; peroxoborates | 3 | 5 |
| 2843 | Colloidal prec metal; prec metal comp & amalgrams | 3 | 5 |
| 2847 | Hydrogen peroxide, whether/not solidified w/ urea | 3 | 5 |
| 2907 | Phenols; phenol-alcohols | 3 | 5 |
| 2909 | Ethers, ether-alcohols, alcohol peroxides etc. | 5 | 5 |
| 2910 | Epoxides with a 3-memb ring & halog, sulfon etc | 5 | 5 |
| 2912 | Aldehydes, its cyclic polymers; paraformaldehyde | 5 | 5 |
| 2914 | Ketones & quinones & halogenatd, sulfonatd der etc | 3 | 5 |
| 2915 | Sat acyclic nonocarbox acid & anhyd, halogon etc | 3 | 5 |
| 2916 | Unsat acyclic & cyclic monocarbox acid & anhyd etc | 3 | 5 |
| 2917 | Polycarboxylic acids & anhyd etc, halog, sulf etc | 3 | 5 |
| 2918 | Carboxylic acid, added oxygen & anhy etc, hal etc | 3 | 5 |
| 2935 | Sulfonamides | 3 | 5 |
| 2936 | Provitamins and vitamins & derivatives & intermixs | 3 | U |
| 2937 | Hormones; derivatives & steriods used as hormones | 3 | U |
| 2938 | Glycosides, natural or synth & salts, ethers etc. | 3 | U |
| 2939 | Veg alkaloids, nat or synth & salts, ethers etc. | 3 | U |
| 2940 | Sugars, chem pure (exc sucrose, lactose, etc) | 3 | U |
| 2941 | Antibiotics | 3 | U |
| 2942 | Organic compounds nesoi | 3 | U |
| 3003 | Medicaments nesoi of mixtures, not dosage etc form | 6 | U |
| 3004 | Medicaments nesoi, mixed or not, in dosage etc fm | 6 | U |
| 3006 | Pharmaceutical goods in note 4 to chapter 30 | 6 | U |

| | | | |
|---|---|---|---|
| 3102 | Mineral or chemical fertilizers, nitrogenous | 5 | U |
| 3103 | Mineral or chemical fertilizers, phosphatic | 5 | U |
| 3104 | Mineral or chemical fertilizers, potassic | 5 | U |
| 3105 | Mineral or chemical fertilizers, other | 5 | U |
| 3208 | Paint & varnish from synth etc polymers nonaq, etc | 3 | 3 |
| 3209 | Paint & varnish from synth etc polymers aqueous md | 3 | 3 |
| 3210 | Paints & varnishes nesoi; watr pigmts for leather | 3 | 3 |
| 3403 | Lubricating preps, antirust & treating textiles etc | 3 | 5 |
| 3601 | Propellant powders | C | U |
| 3602 | Prepared explosives other than propellent powders | C | U |
| 3603 | Safety fuses; detonating fuse; percussion caps etc | C | U |
| 3604 | Fireworks, signalling flares, rain rockets etc. | 0 | U |
| 3706 | Motion-picture film, exposed and developed | C | G |
| 3808 | Insecticides, rodenticides; fungicides etc, retail | 5 | U |
| 3812 | Prepared rubber accelerators; com plasticizers etc | 5 | 5 |
| 3819 | Hydraulic brake fluids/liq for hydraulic trans etc | 3 | 5 |
| 3901 | Polymers of ethylene, in primary forms | 0 | 4 |
| 3902 | Polymers of propylene or other olefins, prim forms | 0 | 4 |
| 3903 | Polymers of styrene, in primary forms | 0 | 4 |
| 3904 | Polymers of vinyl chloride etc., in primary forms | 0 | 4 |
| 3905 | Polymers of vinyl acetate & oth vinyl polym, pr fm | 0 | 4 |
| 3906 | Acrylic polymers in primary forms | 0 | 4 |
| 3907 | Polyethers, expoxides & polyesters, primary forms | 0 | 4 |
| 3908 | Polyamides in primary forms | 0 | 4 |
| 3909 | Amino-resins, phenolics & polyurethanes, prim form | 0 | 4 |
| 3910 | Silicones, in primary forms | 0 | 4 |
| 3911 | Petro resins, polysulfides etc nesoi, primary form | 0 | 4 |
| 3912 | Cellulose and chemical deriv nesoi, primary forms | 0 | 4 |
| 3913 | Natural polymers and modified natural polymers | 0 | 4 |
| 40111000 | Tires of a kind used on motor cars | 5 | 5 |
| 40112010 | Tires with a width of 450 mm | 5 | 5 |
| 40114000 | Tires of a kind used on motorcycles | 5 | 5 |
| 40131010 | Inner tubes for tires of a width of 450 mm | 2 | 3 |
| 40139020 | Inner tubes of a kind used on motorcycles | 2 | 3 |
| 4801 | Newsprint, in rolls or sheets | 5 | 7 |
| 4802 | Paper, uncoat, for writing etc, rolls; hndmd paper | 5 | 7 |
| 4804 | Kraft paper & paperboard, uncoat nesoi, rolls etc | 5 | 7 |

| | | | |
|---|---|---|---|
| 4807 | Composite paper & paperboard, no surf coat, rl etc | 5 | 7 |
| 4810 | Paper & paperboard, coated with kaolin etc, rl etc | 5 | 7 |
| 4820 | Registers, notebooks, binders, bus forms etc, papr | 0 | 7 |
| 4823 | Paper, paperboard, cellul wad to size & arts nesoi | 5 | 7 |
| 4901 | Books, brochures & similar printed matter | C | U |
| 4902 | Newspapers, journals & periodicals | C | U |
| 4903 | Children's picture, drawing or coloring books | C | U |
| 4907 | Unused postage, check forms, banknotes, stock, etc | C | U |
| 4909 | Printed or illust post cards, greeting cards, etc. | C | U |
| 4910 | Calendars, calendar blocks of any kind, printed | C | U |
| 4911 | Printed matter nesoi, incl print pictures & photos | C | U |
| 5007 | Woven fabrics of silk or silk waste | 5 | 5 |
| 5111 | Woven fabrics of carded wool or fine animal hair | 5 | 5 |
| 5112 | Woven fabrics of combed wool or fine animal hair | 5 | 5 |
| 5208 | Woven cotton fabrics, nu 85% cot, wt nov 200 g/m2 | 5 | 5 |
| 5209 | Woven cotton fabrics, nu 85% cot, wt ov 200 g/m2 | 5 | 5 |
| 5210 | Woven cotton fabrics, un85%cot, mmfmix, nov200g/m2 | 5 | 5 |
| 5211 | Woven cotton fabrics, un85%cot, mmfmix, ov200g/m2 | 5 | 5 |
| 5212 | Woven cotton fabrics nesoi | 5 | 5 |
| 6001 | Pile fabrics, knitted or crocheted | 5 | 5 |
| 6002 | Knitted or crocheted fabrics, nesoi | 5 | 5 |
| 6810 | Articles of cement, concrete or artificial stone | 5 | 5 |
| 6908 | Glazed ceramic flags & paving, hearth tiles, etc | 5 | 5 |
| 6910 | Ceramic sinks, washbasins, water closet bowls etc | 5 | 5 |
| 7004 | Drawn & blown glass, in sheets etc | 5 | 7 |
| 7005 | Float glass & surf ground or polished sheets etc | 5 | 7 |
| 7016 | Glass paving blocks etc; gl cubes, lead window etc | 5 | 7 |
| 7208 | Fl-rl iron & na steel nun600mm wd hot-rl, not clad | 5 | 5 |
| 7209 | Fl-rl iron & na steel nun600mm wd cold-rl, no clad | 5 | 5 |
| 7210 | Fl-rl iron & na steel nun600mm wd, clad etc | 5 | 5 |
| 7211 | Fl-rl iron & na steel un 600mm wd, not clad etc | 5 | 5 |
| 7212 | Fl-rl iron & na steel un 600mm wd, clad etc | 5 | 5 |
| 7213 | Bars & rods, iron & na steel, h-r irreg coils | 5 | 5 |
| 7214 | Bars & rods, iron & na steel nesoi, h-r etc | 5 | 5 |
| 7215 | Bars & rods, iron & na steel nesoi | 5 | 5 |
| 7216 | Angles, shapes & sections of iron & nonalloy steel | 5 | 5 |
| 7217 | Wire of iron & nonalloy steel | 5 | 5 |

| | | | |
|---|---|---|---|
| 7303 | Tubes, pipes and hollow profiles of cast iron | 5 | 5 |
| 7304 | Tubes, pipes etc, seamless, iron nesoi & steel | 5 | 5 |
| 7305 | Tubes & pipes nesoi, ext dia ov406-4mm, ir & steel | 5 | 5 |
| 7306 | Tubes, pipes & hollow profiles nesoi, iron & steel | 5 | 5 |
| 7604 | Aluminum bars, rods and profiles | 3 | 4 |
| 7614 | Stranded wire, cables etc, aluminum, no elec insul | 3 | 4 |
| 8407 | Spark-ignition recip or rotary int comb piston eng | 4 | 5 |
| 8408 | Compression-ignition internal comb piston engines | 4 | 5 |
| 8409 | Parts for engines of heading 8407 or 8408 | 3 | 5 |
| 8414 | Air or vac pumps, compr & fans; hoods & fans; pts | 3 | 5 |
| 8415 | Air conditioning machines (temp & hum change), pts | 3 | 5 |
| 8418 | Refrigerators, freezers etc; heat pumps nesoi, pts | 3 | 5 |
| 8420 | Calendering machines etc nesoi & cylinders, parts | 4 | 5 |
| 8421 | Centrifuges; filter etc mach for liq or gases; pts | 0 | 2 |
| 84248100 | Mech appl to disperse liq etc; sand etc blast mach | 0 | 2 |
| 8426 | Ship's derricks; cranes; mobile lifting frames etc | 0 | 5 |
| 8427 | Fork-lift trucks; oth works trucks with lifts etc. | 0 | 5 |
| 8428 | Lifting, handling, loading & unload machines nesoi | 0 | 5 |
| 8429 | Self-propelled bulldozers, graders, scrapers etc | 4 | 5 |
| 8430 | Mach nesoi, moving, grad etc; pile-dr; snoplow etc | 5 | 5 |
| 8431 | Parts for machinery of headings 8425 to 8430 | 5 | 5 |
| 8432 | Agricult etc mach for soil etc; lawn rollers; pts | 5 | 7 |
| 8433 | Harvest etc machines, cleaning eggs etc nesoi, pts | 5 | 7 |
| 8435 | Presses etc for wine, cider, fruit juice etc, pts | 4 | 7 |
| 8436 | Agri etc & poultry etc equip, inc incubators, pts | 5 | 7 |
| 8437 | Mach for cleaning seed etc & work cereal etc, pts | 5 | 7 |
| 8438 | Mach nesoi, ind prep of food or drink etc, parts | 5 | 7 |
| 8442 | Mach etc nesoi for typeset, making pr plates etc | C | U |
| 8443 | Print mach incl ink-jet mach ancil t prnt pt nesoi | C | U |
| 8444 | Machines extruding, drawing etc manmade textiles | 3 | 5 |
| 8445 | Machines for preparing textile fibers & yarns | 3 | 5 |
| 8446 | Weaving machines (looms) | 3 | 5 |
| 8447 | Machines, knitting, stitch-bond, lace, net etc. | 3 | 5 |
| 8448 | Auxiliary machinery for use with textile machines | 3 | 5 |
| 8451 | Machinery (not laundry) for cleaning, drying etc | 3 | 5 |
| 8452 | Sewing machines (not book-sew), cover etc; needles | 3 | 5 |
| 8453 | Machinery for work leather etc & footwear etc, pts | 3 | 5 |

| 8455 | Metal-rolling mills and rolls therefor; parts | 5 | 5 |
|------|----------------------------------------------|---|---|
| 8458 | Lathes for removing metal, incl turning centers | 5 | 5 |
| 8459 | Machine tools for drilling, boring, milling etc | 5 | 5 |
| 8460 | Machine tools for honing or finishing metal etc | 5 | 5 |
| 8461 | Machine tools for shaping, slotting, gear cut etc | 5 | 5 |
| 8462 | Machine tools for forging, bending, stamping etc | 5 | 5 |
| 8466 | Parts etc for machine tools of head 8456 to 8465 | 5 | 5 |
| 8468 | Machines, solder etc; gas surf temper machines, pt | 5 | 5 |
| 8469 | Typewriters & word processing machines | 5 | 7 |
| 8470 | Calculating & account machines, cash registers etc | 5 | 7 |
| 8471 | Automatic data process machines; magn reader etc | 3 | 7 |
| 8472 | Office machines nesoi (hectograph, addressing etc) | 5 | 5 |
| 8473 | Parts etc for typewriters & other office machines | 3 | 7 |
| 8476 | Automatic goods-vending machines, parts | 5 | 5 |
| 8477 | Machinery for working rubber & plast etc nesoi, pt | 4 | 5 |
| 8501 | Electric motors and generators (no sets) | 5 | 5 |
| 8502 | Electric generating sets and rotary converters | 5 | 5 |
| 8504 | Elec trans, static conv & induct, adp pwr supp, pt | 5 | 7 |
| 8506 | Primary cells & batteries, parts | 4 | 7 |
| 8507 | Electric storage batteries, incl separators, parts | 5 | 7 |
| 8516 | Elec water, space & soil heaters; hair etc dry, pt | 5 | 5 |
| 8517 | Electric apparatus for line telephony etc, parts | 0 | 5 |
| 8519 | Turntables, record & cassette players etc. | 5 | 7 |
| 8520 | Magnetic tape & other sound recorders | 5 | 7 |
| 8521 | Video recrdng/reproduc appar wheth/nt video tuner | 5 | 7 |
| 8524 | Records, tapes & other recorded sound media etc | C | U |
| 8525 | Trans appar for radiotele etc; tv camera & rec | C | U |
| 8526 | Radar apparatus, radio navig aid & remote cont app | C | U |
| 8527 | Reception apparatus for radiotelephony etc | 0 | 7 |
| 8528 | Tv recvrs, incl video monitors & projectors | 5 | 7 |
| 8529 | Parts for television, radio and radar apparatus | U | U |
| 8535 | Electrical apparatus for switching etc, ov 1000 v | 5 | 5 |
| 8536 | Electrical apparatus for switching etc, nov 1000 v | 3 | 5 |
| 8537 | Boards, panels etc elec switch and n/c appar etc. | 5 | 5 |
| 8540 | Thermionic, cold cathode or photocathode tubes, pt | 3 | 3 |
| 8542 | Electronic integrated circuits & microassembl, pts | 0 | 5 |
| 8544 | Insulated wire, cable etc; opt sheath fib cables | 5 | 5 |

| 8701 | Tractors (other than works trucks of heading 8709) | 6 | 7 |
| 8702 | Motor vehicle f trnspt >ten persons includ driver | 6 | 7 |
| 8703 | Motor cars & vehicles for transporting persons | 6 | 7 |
| 8704 | Motor vehicles for transport of goods | 6 | 7 |
| 8705 | Special purpose motor vehicles nesoi | 6 | 7 |
| 8706 | Chas w eng f trac, mtr veh f pass/gd & special pur | 6 | 7 |
| 8707 | Bodies (including cabs), for specif motor vehicles | 3 | 7 |
| 8708 | Parts & access for motor vehicles (head 8701-8705) | 5 | 7 |
| 8709 | Works trucks, self-prop, no lift; stat tractrs; pt | 5 | 7 |
| 8711 | Motorcycles (incl mopeds) & cycles with aux motor | 5 | 7 |
| 8714 | Parts & access for cycles & invalid carriages | 5 | 7 |
| 8716 | Trailers etc; other vehicles, not mech propeld, pt | 5 | 5 |
| 9001 | Opt fibers & bund etc; pol sheets; unmoun opt elem | 5 | 5 |
| 9704 | Postage or revenue stamps, firstday covers | C | U |

## Annex D2- Phase-Out Periods for Restrictions on Export Trading Rights

*Notes:*
*U=Unbound*
*For purposes of Annex D2, phase-out periods for Export Trading Rights shall begin on the date upon which joint ventures are first permitted under Chapter I, Article 2, paragraph 7(D) of this Agreement

| HS Heading | Description | Phase-Out Period (yrs.)* |
|---|---|---|
| 0901 | Coffee; coffee husks etc; substitutes with coffee | 7 |
| 1006 | Rice | U |
| 2502 | Unroasted iron pyrites | 5 |
| 2509 | Chalk | 5 |
| 2511 | Natural barium sulfate; nat barium carbonate nesoi | 5 |
| 2519 | Magnesite; fused magnesia; d-b magn; m oxide nesoi | 5 |
| 2524 | Asbestos | 5 |
| 2525 | Mica, including splittings; mica waste | 5 |
| 2526 | Natural steatite, roughly trimmed etc; talc | 5 |
| 2527 | Natural cryolite; natural chiolite | 5 |
| 2528 | Natural borates & conc; natural boric acid nov 85% | 5 |
| 2529 | Feldspar; leucite; nepheline, n syenite; fluorspar | 5 |
| 2530 | Mineral substances nesoi | 5 |

| 2601 | Iron ores & concentrates, including roast pyrites | 5 |
|------|------|------|
| 2602 | Manganese ores a concntrts inc ferr mangn iron ore | 5 |
| 2603 | Copper ores and concentrates | 5 |
| 2604 | Nickel ores and concentrates | 5 |
| 2605 | Cobalt ores and concentrates | 5 |
| 2606 | Aluminum ores and concentrates | 5 |
| 2607 | Lead ores and concentrates | 5 |
| 2608 | Zinc ores and concentrates | 5 |
| 2609 | Tin ores and concentrates. | 5 |
| 2610 | Chromium ores and concentrates. | 5 |
| 2611 | Tungsten ores and concentrates. | 5 |
| 2612 | Uranium or thorium ores and concentrates. | 5 |
| 2613 | Molybdenium ores and concentrates. | 5 |
| 2614 | Titanium ores and concentrates. | 5 |
| 2615 | Niobium, tantalum, vanadium or zirconium ores and concentrates. | 5 |
| 2616 | Precius metal ores and concentrates. | 7 |
| 2617 | Other ores and concentrates. | 5 |
| 2618 | Granulated slag (slag sand) from the manufacture of iron or steel. | 3 |
| 2701 | Coal, briquettes, ovoids and similar solid fuels manufactured from coal. | 3 |
| 2707 | Oils and other products of the distillation of high temperature coal tars; similar products in which the weight of the aromatic constituents exceeds that of the non-aromatic constituents. | 5 |
| 2708 | Pitch and pitch coke, obtained from coal or from other mineral tars. | 5 |
| 2709 | Petroleum oils and oils obtained from bituminous minerals crude. | U |
| 2711 | Petroleum gases and other gaseous hydrocarbons. | U |

| 2712 | Petroleum jelly, paraffin wax, micro-crystalline petroleum wax, slack wax, ozokerite, lignite wax, peat wax, other mineral waxes and similar products obtained by synthesis or by other processes. | 3 |
|------|------|------|
| 2713 | Petroleum coke, petroleum bitumen and other residues of petroleum oils or of oils obtained from bituminous minerals. | 5 |
| 2714 | Bitumen and asphalt, natural; bituminous or oil slade and tar sands; asphaltites and asphaltic rocks. | 5 |
| 2715 | Bituminous mixtures based on natural asphalt, on natural bitumen, on petroleum bitumen, on mineral tar or mineral tar pitch (for example, bituminous mastics, cut-backs). | 5 |
| 2716 | Electrical energy | 7 |
| 4001 | Natural rubber | 7 |
| 4002 | Synthetic rubber and factive derived from oils | 7 |
| 7102 | Diamonds, whether or not worked, but not mounted or set. | U |
| 7103 | Precious stones (other than diamonds) and semi-precious stone, whether or not worked or graded but not strung, mounted or set; ungraded precious stones (other than diamonds) and semi-precious stones, temporarily strung for convenience of transport. | U |
| 7104 | Synthetic and reconstructed precious or semi-precious stones, whether or not worked or graded but not strung, mounted or set; ungraded synthetic or reconstructed precious or semi-precious stones, temporarily strung for convenience of transport. | U |
| 7105 | Dust and powder of natural or synthetic precious or semi-precious stones. | U |
| 7106 | Silver (including silver plated with gold or platinum), unwrought or in semi-manufactured forms. | U |
| 7108 | Gold (including gold plated with platinum) unwrought or in semi-manufactured forms, or in powder form. | U |

# ANNEX E - TARIFFS

## VIETNAM

Tariffs on Agricultural Products

*Notes:*
*\* - Tariffs marked with an (\*) are to be implemented 6 years from the date of entry into force of this Agreement.*

| HS Number | Description | Current Tariffs | Tariffs to be Implemented by three years after the date of entry into force of this Agreement |
|---|---|---|---|
| | | | |
| 0204 | **Meat of sheeps or goats, chilled or frozen** | | |
| 0204.10.00 | - Carcasses and half-carcasses of lamb, fresh or chilled | 20% | 10% |
| | - Other meat of sheep, fresh or chilled | | |
| 0204.21.00 | - Carcasses and half carcasses | 20% | 10% |
| 0204.22.00 | - Other cuts with bone in | 20% | 10% |
| 0204.23.00 | - Boneless | 20% | 10% |
| 0204.30.00 | - Carcasses and half-carcasses of lamb, frozen | 20% | 10% |
| | - Other meat of sheep, frozen: | | |
| 0204.41.00 | - Carcasses and half carcasses | 20% | 10% |
| 0204.42.00 | - Other cuts with bone in | 20% | 10% |
| 0204.43.00 | - Boneless | 20% | 10% |
| 0204.50.00 | - Meat of goats | 20% | 10% |
| | | | |
| 0206 | **Edible offal of bovine animals, swine, sheep, goats, horses, asses, mules or hinnies, fresh, chilled or frozen** | | |
| 0206.10.00 | - Of bovine animals, fresh or chilled | 20% | 15% |
| | - Of bovine animals, frozen | | |
| 0206.21.00 | - Tongues | 20% | 15% |

| | | | |
|---|---|---|---|
| 0206.22.00 | - Livers | 20% | 15% |
| 0206.29.00 | - Other | 20% | 15% |
| 0206.30.00 | - Of swine, fresh or chilled | 20% | 15% |
| | - Of swine, frozen: | | |
| 0206.41.00 | - Livers | 20% | 15% |
| 0206.49.00 | - Other | 20% | 15% |
| 0206.80.00 | - Other, fresh or chilled | 20% | 10% |
| 0206.90.00 | - Other, frozen | 20% | 10% |
| | | | |
| 0207 | **Meat and edible offal, of the poultry of heading No.  01.05, fresh, chilled or frozen** | | |
| | - Of duck, geese or guinea fowls: | | |
| 0207.34.00 | - Fatty livers, fresh or chilled | 20% | 15% |
| 0207.35.00 | - Other, fresh or chilled | 20% | 15% |
| 0207.36.00 | - Other , frozen | 20% | 15% |
| | | | |
| 0208 | **Other meat and edible meat offal, fresh, chilled or frozen** | | |
| 0208.10.00 | - Of rabbits or hares | 20% | 10% |
| 0208.20.00 | - Frog" legs | 20% | 10% |
| 0208.90.00 | - Other | 20% | 10% |
| | | | |
| 0406 | **Cheese and curd** | | |
| 0406.10 | - Fresh cheese (including whey cheese), not fermented, and curd | | |
| 0406.10.10 | - Fresh cheese (including whey cheese), not fermented | 30% | 10% |
| 0406.10.20 | - Curd | 15% | 10% |
| 0406.20.00 | - Grated or powdered cheese, of all kinds | 30% | 10% |
| 0406.30.00 | - Processed cheese, not grated or powdered | 30% | 10% |
| 0406.40.00 | - Blue-veined cheese | 30% | 10% |
| 0406.90.00 | - Other | 30% | 10% |
| | | | |
| 0409.00.00 | **Natural Honey** | 20% | 10% |
| | | | |
| 0410.00 | **Edible products of animal origin, not elsewhere specified or included** | | |

-E2-

| | | | |
|---|---|---|---|
| 0410.00.10 | - Swallow's net | 20% | 5% |
| 0410.00.90 | - Other | 20% | 5% |
| | | | |
| 0701 | **Potatoes, fresh or chilled** | | |
| 0701.90.00 | - Other | 30% | 20% |
| | | | |
| 0702.00.00 | **Tomatoes, fresh or chilled** | 30% | 20% |
| | | | |
| 0703 | **Onions, shallots, garlic, leeks, and alliaceous vegetables, fresh or chilled** | | |
| 0703.10.00 | - Onions and shallots | 30% | 20% |
| 0703.20.00 | - Garlic | 30% | 20% |
| 0703.90.00 | - Leeks and other alliaceous vegetables | 30% | 20% |
| | | | |
| 0704 | **Cabbages, cauliflowers, kohlrabi, kale and similar edible brassicas, fresh or chilled** | | |
| 0704.10.00 | - Cauliflowers and headed broccoli | 30% | 20% |
| 0704.20.00 | - Brussels sprouts | 30% | 20% |
| 0704.90.00 | - Other | 30% | 20% |
| | | | |
| 0705 | **Lettuce (lactuca sativa) and chicory (cichorium spp.),  fresh or chilled** | | |
| | - Lettuce: | | |
| 0705.11.00 | - Cabbage lettuce (headed lettuce) | 30% | 20% |
| 0705.19.00 | - Other | 30% | 20% |
| | - Chicory | | |
| 0705.21.00 | - Witloof chicory (cichorium intybus var.  foliosum) | 30% | 20% |
| 0705.29.00 | - Other | 30% | 20% |
| | | | |
| 0706 | **Carrots, turnip, salad beetroot, salsify, celeriac, radishes and similar edible roots, fresh or chilled** | | |
| 0706.10.00 | - Carrots and turnips | 30% | 20% |
| 0706.90.00 | - Other | 30% | 20% |
| | | | |
| 0707.00.00 | **Cucumbers and gherkins, fresh or** | 30% | 20% |

| | | | |
|---|---|---|---|
| | chilled | | |
| | | | |
| **0709** | **Other vegetables, fresh or chilled** | | |
| 0709.10.00 | - Globe artichokes | 30% | 15% |
| 0709.20.00 | - Asparagus | 30% | 15% |
| 0709.30.00 | - Aubergines (egg plants) | 30% | 20% |
| 0709.40.00 | - Celery other than celeriac | 30% | 15% |
| | - Mushrooms and truffles | | |
| 0709.51.00 | - Mushrooms | 30% | 20% |
| 0709.52.00 | - Truffles | 30% | 20% |
| 0709.60 | - Fruit of the genus Capsicum or of the genus Pimenta | | |
| 0709.60.10 | - Chilies | 30% | 20% |
| 0709.60.90 | - Other | 30% | 20% |
| 0709.70.00 | - Spinach, New Zealand spinach and orache spinach (garden spinach) | 30% | 20% |
| 0709.90.00 | - Other | 30% | 20% |
| | | | |
| **0710** | **Vegetables (uncooked or cooked by steaming or boiling in water), frozen** | | |
| 0710.10.00 | - Potatoes | 30% | 20% |
| 0710.30.00 | - Spinach, New Zealand spinach and orange spinach (garden spinach) | 30% | 15% |
| | | | |
| **0711** | **Vegetables provisionally prepared ( for example, by sulphur dioxide gas, in brine, in sulphur water or in other preservative solutions), but unsuitable in that state for immediate consumption** | | |
| 0711.20.00 | - Olives | 30% | 15% |
| 0711.30.00 | - Capers | 30% | 15% |
| | | | |
| **0806** | **Grapes: fresh or dried** | | |
| 0806.10.00 | - Fresh | 40% | 25% |
| 0806.20.00 | - Dried | 40% | 25% |
| | | | |
| **0808** | **Apples, pears and quinces: fresh** | | |
| 0808.10.00 | - Apples | 40% | 25% |
| 0808.20.00 | - Pears and quinces | 40% | 25% |

-E4-

| | | | |
|---|---|---|---|
| 0810 | **Other fruit, fresh** | | |
| 0810.10.00 | - Strawberries | 40% | 15% |
| 0810.20.00 | - Raspberries, blackberries, mulberries and loganberries | 40% | 15% |
| 0810.30.00 | - Black, white or red currants and gooseberries | 40% | 15% |
| 0810.40.00 | - Cranberries, bilberries and other fruits of the genus Vaccinium | 40% | 15% |
| 0810.50.00 | - Kiwifruit | 40% | 15% |
| 1002.00.00 | **Rye** | 3% | 3% |
| | | | |
| 1003.00.00 | **Barley** | 3% | 3% |
| | | | |
| 1004.00.00 | **Oats** | 3% | 3% |
| | | | |
| 1007.00.00 | **Grain sorghum** | 10% | 5% |
| | | | |
| 1008 | **Buckwheat, millet and canary seed; other cereals** | | |
| 1008.10.00 | - Buckwheat | 10% | 5% |
| 1008.20.00 | - Millet | 10% | 5% |
| 1008.90.00 | - Other cereals | 10% | 5% |
| | | | |
| 1101 | **Wheat or meslin flour** | | |
| 1101.00.10 | - Wheat flour | 20% | 20% |
| | | | |
| 1102 | **Cereal flours other than of wheat or meslin** | | |
| 1102.10.00 | - Rye flour | 20% | 15% |
| 1102.20.00 | - Maize (corn) flour | 20% | 15% |
| 1102.90.00 | - Other | 20% | 15% |
| | | | |
| 1103 | **Cereal groats, meal and pellets** | | |
| | - Groats and meal: | | |
| 1103.13.00 | – Of maize (corn) | 10% | 10% |
| | | | |
| 1104 | **Cereal grains otherwise worked(for** | | |

-E5-

|  |  |  |  |
|---|---|---|---|
|  | example, hulled, rolled, flaked, pearled, sliced or kibbed), except rice of heading No.  10.06; germ of cereals, whole, rolled, flaked or ground |  |  |
| 1104.23 | - Cereal grains otherwise worked (for example, hulled, rolled, flaked, pearled, sliced or kibbed) |  |  |
| 1104.23.00 | – Of maize (corn) | 10% | 10% |
|  |  |  |  |
| 1201.00.00 | **Soya beans, whether or not broken** | 10% | 5% |
|  |  |  |  |
| 1202 | **Ground nuts, not roasted or otherwise cooked, whether or not shelled or broken** |  |  |
| 1202.10.00 | - In shell | 10% | 10% |
| 1202.20.00 | - Shelled, whether or not broken | 10% | 10% |
|  |  |  |  |
| 1203.00.00 | **Copra (coconut)** | 10% | 10% |
|  |  |  |  |
| 1206.00.00 | **Sunflower seeds, whether or not broken** | 30% | 10% |
|  |  |  |  |
| 1207 | **Other oil seeds and oleaginous fruits, whether or not broken** |  |  |
| 1207.20.00 | - Cotton seeds | 10% | 5% |
|  |  |  |  |
| 1507 | **Soya-bean oil and its fractions, whether or not refined, but not chemically modified** |  |  |
| 1507.90 | - Other: |  |  |
| 1507.90.10 | - Refined | 40% | 30% |
|  |  |  |  |
| 1508 | **Ground-nut oil and its fractions, whether or not refined, but not chemically modified** |  |  |
| 1508.90 | - Other: |  |  |
| 1508.90.10 | - Refined | 40% | 30% |
|  |  |  |  |

-E6-

| 1509 | **Olive oil and its fractions, whether or not refined, but not chemically modified** | | |
|---|---|---|---|
| 1509.10.00 | - Virgin | 5% | 5% |
| 1509.90 | - Other: | | |
| 1509.90.10 | - Refined | 40% | 30% |
| | | | |
| 1510 | **Other oils and their fractions, obtained solely from olives, whether or not refined, but not chemically modified, including blends of these oils or fractions with oils or fractions of heading No. 1519** | | |
| 1510.00.10 | - Crude oils | 5% | 5% |
| | - Other: | | |
| 1510.00.91 | - Refined | 40% | 30% |
| | | | |
| 1511 | **Palm oil and its fractions, whether or not refined, but not chemically modified** | | |
| 1511.10 | - Crude oil | | |
| 1511.10.10 | - Palm oil | 5% | 5% |
| 1511.10.90 | - Other | 5% | 5% |
| 1511.90 | - Other: | | |
| 1511.90.90 | - Other | 40% | 30% |
| | | | |
| 1512 | **Sunflower-seed, safflower or cotton-seed oil and fractions thereof, whether or not refined but not chemically modified** | | |
| | - Sunflower-seed or safflower oil and fractions thereof: | | |
| 1512.11.00 | - Crude oil | 5% | 5% |
| 1512.19 | - Other | | |
| 1512.19.10 | -Refined: | 40% | 30% |
| | | | |

-E7-

| | | | |
|---|---|---|---|
| 1513 | **Coconut (copra), palm kernel or babassu oil and fractions thereof, whether or not refined but not chemically modified** | | |
| | - Coconut (copra) oil and its fractions: | | |
| 1513.19 | – Other: | | |
| 1513.19.10 | - Refined | 40% | 30% |
| | | | |
| 1514 | **Rape, colza or mustard oil and fractions thereof, whether or not refined, but not chemically modified** | | |
| 1514.10.00 | - Crude oil | 5% | 5% |
| 1514.90 | - Other: | | |
| 1514.90.10 | - Refined | 40% | 30% |
| 1515 | **Other fixed vegetable fats and oils (including jojoba oil) and their fractions, whether or not refined, but not chemically modified** | | |
| 1515.90 | - Other: | | |
| 1515.90.99 | - Other | 40% | 30% |
| | | | |
| 1516 | **Animal or vegetable fats and oils and their fractions, partly or wholly hydrogenated, inter-esterified, re-esterified or elaidinised, whether or not refined, but not further prepared** | | |
| 1516.10.00 | - Animal fats and oils and their fractions | 40% | 30% |
| 1516.20.00 | - Vegetable fats and oils and their fractions | 40% | 30% |
| | | | |
| 1517 | **Margarine; edible mistures or preparations of animal or vegetable fats or oils or of fractions of different fats or oils of this Chapter, other than edible fats or oils or their fractions of heading** | | |
| 1517.10.00 | - Margarine, excluding liquid margarine | 40% | 30% |

| | | | |
|---|---|---|---|
| 1601 | **Sausages and similar products, of meat, meat offal or blood; food preparations based on these products** | 50% | 40%* |
| | | | |
| 1602 | **Other prepared and preserved meat, meat offal or blood** | | |
| 1602.10.00 | - Homogenized preparations | 50% | 40%* |
| 1602.20.00 | - Of liver of any animal | 50% | 40%* |
| | - Of poultry of heading No. 0105: | | |
| 1602-31.00 | - Of turkeys | 50% | 40%* |
| 1602.32.00 | - Of fowls of the species Gallus domesticus | 50% | 40%* |
| 1602.39.00 | - Other | 50% | 40%* |
| | - Of swine: | | |
| 1602.41.00 | - Hams and cuts thereof | 50% | 40%* |
| 1602.42.00 | - Shoulders and cuts thereof | 50% | 40%* |
| 1602.49.00 | - Other, including mixtures | 50% | 40%* |
| 1602.50.00 | - Of bovine animals | 50% | 40%* |
| 1602.90.00 | - Other , including preparations of blood of any animal | 50% | 40%* |
| | | | |
| 1603.00.00 | **Extracts and juices of meat, fish or crustaceans, molluscs or other aquatic invertebrates** | 50% | 30% |
| | | | |
| 1604 | **Prepared or preserved fish; caviar and caviar substitutes prepared from fish eggs** | | |
| | - Fish, whole or in pieces, but not minced: | | |
| 1604.11.00 | - Salmon | 50% | 40% |
| 1604.12.00 | - Herrings | 50% | 40% |
| 1604.13.00 | - Sardines, sardinella and brisling or sprats | 50% | 40% |

| | | | |
|---|---|---|---|
| 1604.14.00 | - Tunas, skipjack and bonito (Sarda spp.) | 50% | 40% |
| 1604.15.00 | - Mackerel | 50% | 40% |
| 1604.16.00 | - Anchovies | 50% | 40% |
| 1604.19.00 | - Other | 50% | 40% |
| 1604.20.00 | - Other prepared or preserved fish | 50% | 40% |
| 1604.30.00 | - Caviar and caviar substitutes | 50% | 40% |
| | | | |
| 1605 | **Crustaceans, molluscs and other aquatic invertebrates, prepared or preserved** | | |
| 1605.10.00 | - Crab | 50% | 40% |
| 1605.20.00 | - Shrimps and prawns | 50% | 40% |
| 1605.30.00 | - Lobster | 50% | 40% |
| 1605.40.00 | - Other crustaceans | 50% | 40% |
| 1605.90.00 | - Other | 50% | 40% |
| | | | |
| 1806 | **Chocolate and other food preparations containing cocoa** | | |
| 1806.10.00 | - Cocoa powder, containing added sugar or other sweetening matter | 30% | 20% |
| 1806.20.00 | - Other preparations in blocks or slabs weighing more than 2 kg or in liquid, paste, powder, granular or other bulk form in containers or immediate packing, of a content exceeding 2 kg | 30% | 20% |
| | - Other, in blocks, slabs or bars | | |
| | | | |
| 1902 | **Pasta, whether or not cooked or stuffed (with meat or other substances or otherwise prepared, such as spaghetti, macaroni, noodles, lasagne, gnocchi, ravioli, cannelloni; couscous, whether or not prepared** | | |
| | - Uncooked pasta, not stuffed or otherwise prepared: | | |
| 1902.11.00 | - Containing eggs | 50% | 40% |

-E10-

| 1902.19.00 | - Other | 50% | 40% |
|---|---|---|---|
| 1902.20.00 | - Stuffed pasta, whether or not cooked or otherwise prepared | 50% | 40% |
| 1902.30.00 | - Other pasta | 50% | 40% |
| 1902.40.00 | - Couscous | 50% | 40% |
| | | | |
| 1903.00.00 | **Tapioca and substitutes therefor prepared from starch, in the form of flakes, grains, pearls, siftings or in similar form** | 50% | 40% |
| | | | |
| 2001 | **Vegetables, fruit, nuts and other edible parts of plants, prepared or preserved by vinegar or acetic acid** | | |
| 2001.10.00 | - Cucumbers and gherkins | 50% | 40% |
| 2001.20.00 | - Onions | 50% | 40% |
| 2001.90.00 | - Other | 50% | 40% |
| | | | |
| 2002 | **Tomatoes prepared or preserved otherwise than by vinegar or acetic acid** | | |
| 2002.10.00 | - Tomatoes, whole or in pieces | 50% | 40% |
| 2002.90 | - Other: | | |
| 2002.90.10 | - Tomato paste | 50% | 40% |
| 2002.90.90 | - Other | 50% | 40% |
| | | | |
| 2003 | **Mushroom and truffles, prepared or preserved otherwise than by vinegar or acetic acid** | | |
| 2003.10.00 | - Mushrooms | 50% | 40% |
| 2003.20.00 | - Truffles | 50% | 40% |
| | | | |
| 2004 | **Other vegetables, prepared or preserved otherwise than by vinegar or acetic acid, frozen other than** | | |

| | products of heading No. 2006 | | |
|---|---|---|---|
| 2004.10.00 | - Potatoes | 50% | 40% |
| 2004.90.00 | - Other vegetables and mixtures of vegetables | 50% | 40% |
| | | | |
| 2005 | **Other vegetables prepared or preserved otherwise than by vinegar or acetic acid, not frozen, other than products of heading No. 20.06** | | |
| 2005.10.00 | - Homogenized vegetables | 50% | 40% |
| | | | |
| 2006 | **Vegetables, fruit, nuts, fruit-peel and other parts of plants, preserved by sugar (drained, glace or crystallised)** | | |
| 2006.00.10 | - Fruits or nuts | 50% | 40% |
| 2006.00.90 | - Other | 50% | 40% |
| | | | |
| 2007 | **Jams, fruit jellies, marmalades, fruit or nut puree and fruit or nut pastes, being cooked preparations, whether or not containing added sugar or other sweetening matter** | | |
| 2007.10.00 | - Homogenized preparation | 50% | 40% |
| | - Other: | | |
| 2007.91.00 | - Citrus fruit | 50% | 40% |
| 2007.99.00 | - Other | 50% | 40% |
| | | | |
| 2008 | **Fruit, nuts and other edible parts of plants, otherwise prepared or preserved, whether or not containing added sugar or other sweetening matter or spirit, not elsewhere specified or included** | | |
| | - Nuts, ground-nuts and other seeds, whether or not mixed together: | | |
| 2008.11 | - Ground nut: | | |
| 2008.11.10 | - Oil-roasted and the like | 50% | 40% |

| | | | |
|---|---|---|---|
| 2008.11.20 | - Coated with sugar | 50% | 40% |
| 2008.11.90 | - Other | 50% | 40% |
| 2008.19 | - Other, including mixtures | | |
| 2008.19.10 | - Prepared cashew | 50% | 40% |
| 2008.19.90 | - Other | 50% | 40% |
| 2008.20.00 | - Pineapples | 50% | 40% |
| 2008.30.00 | - Citrus fruit | 50% | 40% |
| 2008.40.00 | - Pears | 50% | 40% |
| 2008.50.00 | - Apricots | 50% | 40% |
| 2008.60.00 | - Cherries | 50% | 40% |
| 2008.70.00 | - Raspberries | 50% | 40% |
| 2008.80.00 | - Strawberries | 50% | 40% |
| | - Other, including mixtures other than those of subheading No. 2008.19: | | |
| 2008.91.00 | - Palm hearts | 50% | 40% |
| 2008.92.00 | - Mixtures | 50% | 40% |
| 2008.99.00 | - Other | 50% | 40% |
| | | | |
| 2009 | **Fruit juices (including grape must) and vegetable juices, unfermented and not containing added spirit, whether or not containing added sugar or other sweetening matter** | | |
| | - Orange juice: | | |
| 2009.11.00 | - Frozen | 50% | 40% |
| 2009.19.00 | - Other | 50% | 40% |
| 2009.20.00 | - Grapefruit juice | 50% | 40% |
| 2009.30.00 | - Juice of any other single citrus fruit | 50% | 40% |
| 2009.40.00 | - Pineapple juice | 50% | 40% |
| 2009.50.00 | - Tomatoes juice | 50% | 40% |
| 2009.60.00 | - Grape juice (including grape must) | 50% | 40% |
| 2009.70.00 | - Apple juice | 50% | 40% |
| 2009.80.00 | - Juice of any other fruit or vegetable | 50% | 40% |

| | | | |
|---|---|---|---|
| 2009.90.00 | - Mixtures of juices | 50% | 40% |
| | | | |
| 2201 | **Waters, including natural or artificial mineral waters and aerated waters, not containing added sugar or other sweetening matter nor flavoured; ice and snow** | | |
| 2201.90.00 | - Other | 50% | 40% |
| | | | |
| 2202 | **Waters, including mineral waters and aerated water containing added sugar or other sweetening matter** or **flavoured, and other non-alcoholic beverages, not including fruit or vegetable juices of heading No.  2009** | | |
| 2202.10 | - Waters, including mineral waters and aerates waters, containing added sugar or other sweetening matter or flavoured: | | |
| 2202.10.10 | - Beverages, flavoved with fruit juices or essences (orangeade, lemonade, strawberrade...) | 50% | 40% |
| 2202.10.20 | - Cola waters and the like | 50% | 40% |
| 2202.10.90 | - Other | 50% | 40% |
| 2202.90.00 | - Other | 50% | 40% |
| | | | |
| 2203.00.00 | **Beer made from malt** | 100% | 80% |
| | | | |
| 2207 | **Undenatured ethyl alcohol of an alcoholic strength by volume of  80% vol or higher; ethyl alcohol or other spirits, denatured, of any strength** | | |
| 2207.10.00 | - Undenatured ethyl alcohol of an alcoholic strength by volume of 80% vol or higher | 50% | 40% |
| 2207.20 | - Ethyl alcohol or other spirits, denatured, of any strength: | | |

| 2207.20.90 | - Other | 50% | 40% |
|---|---|---|---|
|  |  |  |  |
| 2209.00.00 | **Vinegar and substitutes for vinegar obtained from acetic acid** | 50% | 20% |
|  |  |  |  |
| 2304.00.00 | **Oil-cake and other solid residues, whether or not ground or in the form of pellets, resulting from the extraction of soya-bean oil**. | 10% | 10% |
|  |  |  |  |
| 2309 | **Preparations of a kind used in animal feeding** |  |  |
| 2309.10.00 | - Dog or cat food, put up for retail sale | 10% | 10% |
| 2309.90 | - Other: |  |  |
| 2309.90.10 | - Shrimp food | 10% | 10% |

**Tariffs on Industrial Products - Vietnam**

| HS Number | Product Description | Current Tariffs *(ad valorem)* | Tariffs to be Implemented three years after the date of entry into force of this Agreement *(ad valorem)* |
|---|---|---|---|
| **33030000** | Perfumes and toilet waters | 50 | 30 |
|  |  |  |  |
| **3304** | **Beauty or make-up preparations and preparations for care of the skin (other than medicaments), including sunscreen or suntan preparations; manicure or pedicure preparations** |  |  |
| 33043000 | - Manicure or pedicure preparations | 50 | 30 |
|  | - Other: |  |  |
| 33049900 | - Other | 50 | 30 |

-E15-

| | | | |
|---|---|---|---|
| **3305** | **Preparations for use on the hair** | | |
| 33051000 | - Shampoos | 50 | 40 |
| 33053000 | - Hair lacquers | 50 | 30 |
| 330590 | - Other: | | |
| 33059010 | - Hair dyes | 50 | 30 |
| 33059090 | - Other | 50 | 30 |
| | | | |
| **3401** | **Soap; organic surface-active products and preparations for use as soap, in the form of bars, cakes, molded pieces or shapes, whether or not containing soap; paper, wadding, felt, and nonwovens, impregnated, coated or covered with soap or detergent** | | |
| 34012000 | -Soap in other form (soap noodles only) | 50 | 30 |
| | | | |
| **3402** | **Organic surface-active agents (other than soap); surface-active preparations, washing preparations (including auxiliary washing preparations) and cleaning preparations, whether or not containing soap, other than those of heading No. 34.01** | | |
| 340290 | - Other: | | |
| 34029090 | - Other (surfactant for hair care only) | 20 | 10 |
| | | | |
| **3701** | **Photographic plates and film in the flat, sensitized, unexposed, of any materials other than paper, paperboard or textiles; instant print film in the flat, sensitized, unexposed, whether or not in packs** | | |
| 37013000 | -Other plated and film, with any side exceeding 255 mm | 15 | 10 |
| | | | |
| **3702** | **Photographic film in rolls, sensitized, unexposed; of any materials other than paper, paperboard or textiles, instant print film inrolls, sensitized, unexposed** | | |
| 37023100 | - for colour photography (polychrome) | 30 | 20 |
| | - Other film, for color photography (polychrome) | | |
| 37025400 | - Of a width exceeding 16 mm but not exceeding 35 mm and of a length not exceeding 30 m, excl. | 30 | 20 |

-E16-

| | | | |
|---|---|---|---|
| | for slides | | |
| 37025500 | - Of a width exceeding 16 mm but not exceeding 35 mm and of a length exceeding 30 m | 30 | 20 |
| 37025600 | - Of a width exceeding 35mm | 30 | 20 |
| | | | |
| **3703** | **Photographic paper, paperboard and textiles, sensitized, unexposed** | | |
| 37032000 | -Other, for colour photography (polychrome) | 30 | 20 |
| | | | |
| **4804** | **Uncoated kraft paper and paperboard, in rolls or sheets, other than that of heading No.  48.02 or 48.03** | | |
| | - Kraftliner: | | |
| 48041100 | – Unbleached | 30 | 20 |
| | | | |
| **6406** | **Parts of footwear; removable in-soles, heel cushions and similar articles; gaiters, leggings and similar articles, and parts therof** | | |
| 64069900 | – Of other materials | 20 | 10 |
| | | | |
| **7323** | **Table, kitchen or other household articles and parts thereof, of iron or steel; iron or steel wool; pot scourers and scouring or polishing pads, gloves and the like, of iron or steel** | | |
| 73239900 | --Other | 30 | 20 |
| | | | |
| **8408** | **Compression-ignition internal combustion piston engines (diesel, semi-diesel)** | | |
| 840820 | - Engines of a kind used for propulsion of vehicles of Chapter 87 | | |
| | – For other vehicles of Chapter 87 | | |
| 84082021 | – For motor vehicles of sub-heading No.  8711, 8703 | 40 | 30 |
| | | | |
| **8415** | **Air conditioning machines, comprising a motor-driven fan and elements for changing the temperature and humidity, including those machines in which the humidity can not be separately regulated** | | |
| 841583 | - Not incorporating a refrigerating unit | | |
| 84158310 | - Of a capacity not excceding 90,000BTU/h | 50 | 30 |
| 84158320 | -Of a capacity exceeding 90,000BTU/h but not exceeding 180,000 BTU/h | 40 | 30 |

| | | | |
|---|---|---|---|
| 84158390 | -Other | 30 | 20 |
| 841590 | -Parts: | | |
| 84159019 | - Other | 30 | 20 |
| | | | |
| **8418** | **Refrigerators, freezers and other refrigerating of freezing equipment, electric or other; heat pumps other than air conditioning machines of heading No.  84.15** | | |
| 841830 | -Freezers if the chest type,  not exceeding 800 l capacity : | | |
| 84183010 | - With capacity not exceeding 200 l | 50 | 30 |
| 84183090 | - With capacity exceeding 200 l but not exceeding 800 l | 30 | 20 |
| 841840 | -Freezers of the upright type, not exceeding 900 l capacity: | | |
| 84184010 | - With capacity not exceeding 200 l | 50 | 40 |
| 84184090 | - With capacity exceeding 200 l but not exceeding 900 l | 30 | 20 |
| 841850 | -Other refrigerating or freezing chests, cabinets, display counters, show cases and similar refrigerating or freezing furniture: | | |
| 84185010 | - With capacity not exceeding 200 l | 50 | 40 |
| 84185090 | - With capacity exceeding 200 l | 30 | 20 |
| | | | |
| | | | |
| **8419** | **Machinery, plant or laboratory equipment, whether or not electrically heated, for the treatment of materials by a process involving a change of temperature such as heating, cooking, roasting, 'distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporising, condensing or cooling, other than machinery or plant of a kind used for domestic purposes; instanteous or storage water heaters, non-electric** | | |
| | - Other machinery, plant and equipment: | | |
| 84198100 | -For making hot drinks or for cooking or  heating food | 30 | 20 |
| | | | |
| **8421** | **Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus for liquids or gases.** | | |
| 842121 | -For filtering or purifying water | | |

| | | | |
|---|---|---|---|
| 84212110 | -Electrical operated with filtering capacity not exceeding 500 1/h | 20 | 15 |
| | | | |
| **8450** | **Household or laundry-type washing machines, including machines which both wash and dry** | | |
| | - Machines, each of a dry linen capacity not exceeding 10 kg: | | |
| 84501100 | -Fully-automatic machines | 50 | 40 |
| 84501200 | -Other machines, with built-in centrifugal drier | 50 | 40 |
| 84501900 | -Other | 50 | 40 |
| 84502000 | -Machines, each of a dry linen capacity  exceeding 10 kg: | 50 | 40 |
| 84509000 | -Parts | 50 | 40 |
| | | | |
| **8481** | **Taps, cocks, valves and similar appliances for pipes, boiler shells, tanks, vats or the like, including pressure-reducing valves and thermostatically controlled valves** | | |
| 848180 | -Other appliances: | | |
| 84818060 | -Valves for water pipe | 20 | 15 |
| | | | |
| **8508** | **Electro-mechanical tools for working in the hand, with self-contained electric motor.** | | |
| 85081000 | -Drills of all kinds | 10 | 5 |
| | | | |
| **8516** | **Electric instantaneous or storage water heaters and immersion heaters; electric space heating apparatus and soil heating apparatus;  electro-thermic hair dressing apparatus (for example, 'hair dryers, hair curlers, curling tong heaters) and hand dryers; electric smoothing irons; other electro-thermic appliances of a kind used for domestic purposes; electric heating resistors, other than those of heading No. 8545** | | |
| 851660 | -Other ovens; cookers, cooking plates, boiling rings, grillers and roasters | | |
| 85166020 | -Boilers including boiling rings | 40 | 30 |
| 85166030 | -Ovens cooker | 40 | 30 |
| 85166090 | -Other | 40 | 30 |
| | | | |
| **8523** | **Prepared unrecorded media for sound recording or similar recording of other** | | |

| | | | |
|---|---|---|---|
| | phenomena, other than products of Chapter 37 | | |
| 852313 | -Of a width exceeding 6.5 mm: | | |
| 85231320 | -Computer magnetic tapes | 20 | 15 |
| | | | |
| **8525** | **Transmission apparatus for radio-telephony, radio-telegraphy, radio-broadcasting or television, whether or not incorporating reception apparatus or sound recording or reproducing.** | | |
| 852520 | -Transmission apparatus incorporating reception apparatus: | | |
| 85252010 | -Cordless telephones (mobile phones) | 20 | 10 |
| 85254000 | -Still image video cameras and other video camera recorders | 30 | 20 |
| | | | |
| **8527** | **Reception apparatus for radio-telephony, radio-telegraphy or radio broadcasting, whether or not combined, in the same housing, with sound recording or reproducing apparatus or a clock** | | |
| 852790 | -Other | | |
| 85279010 | -Pager | 15 | 10 |
| | | | |
| **8529** | **Parts suitable for use soley or principally with the apparatus of headings Nos. 85.25 tp 85.28** | | |
| 85291000 | | 30 | 20 |
| **9006** | **Photographic (other than cinematographic) cameras; photographic flashlight apparatus and flashbulbs other than discharge lamps of heading No. 8539** | | |
| 90065300 | -Other, for roll film of a width of 35 mm | 30 | 20 |
| | | | |
| **9504** | **Articles for funfair, table or parlour games, including pintables, billards, special tables for casino games and automatic bowling alley equipment** | | |
| 95041000 | -Video games of a kind used with a television receiver | 50 | 30 |
| 95049000 | -Other | 50 | 30 |

# CHAPTER II

# INTELLECTUAL PROPERTY RIGHTS

### Article 1
### Objectives, Principles and Scope of Obligations

1.  Each Party shall provide in its territory to the nationals of the other Party adequate and effective protection and enforcement of intellectual property rights.

2.  The Parties recognize the underlying public policy objectives of national systems for the protection of intellectual property, including developmental and technological objectives, and ensure that measures to protect and enforce intellectual property rights do not themselves become barriers to legitimate trade.

3.  To provide adequate and effective protection and enforcement of intellectual property rights, each Party shall, at a minimum, give effect to this Chapter and the substantive economic provisions of:

    A.  the Geneva Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of their Phonograms, 1971 (Geneva Convention);

    B.  the Berne Convention for the Protection of Literary and Artistic Works, 1971 (Berne Convention);

    C.  the Paris Convention for the Protection of Industrial Property, 1967 (Paris Convention);

    D.  the International Convention for the Protection of New Varieties of Plants, 1978 (UPOV Convention (1978)), or the International Convention for the Protection of New Varieties of Plants, 1991 (UPOV Convention (1991)); and

    E.  the Convention Relating to the Distribution of Programme-Carrying Signals Transmitted by Satellite (1974).

    If a Party has not acceded to the specified text of any such Conventions on or before the date of entry into force of this Agreement, it shall promptly make every effort to accede.

4.  A Party may implement in its domestic law more extensive protection and enforcement of intellectual property rights than is required under this Chapter, provided that such protection and enforcement are not inconsistent with this Chapter.

**Article 2**
**Definitions**

For purposes of this Chapter:

1.    "confidential information" includes trade secrets, privileged information, and other undisclosed information that has not become subject to an unrestricted public disclosure under the Party's domestic law.

2.    "encrypted program-carrying satellite signal" means a program-carrying satellite signal that is transmitted in a form whereby the aural or visual characteristics, or both, are modified or altered for the purpose of preventing the unauthorized reception of a program carried in that signal by persons without the authorized equipment that is designed to eliminate the effects of such modification or alteration.

3.    "intellectual property rights" refers to copyrights and related rights, trademarks, patents, layout designs (topographies) of integrated circuits, encrypted program-carrying satellite signals, confidential information (trade secrets), industrial designs and rights in plant varieties.

4.    "lawful distributor of an encrypted satellite signal" in a Party means the person who originally transmitted the signal.

5.    "national" of a Party shall, in respect of the relevant intellectual property rights, be understood as those natural or legal persons that would meet the criteria for eligibility for protection provided for in the Paris Convention, the Berne Convention, the Geneva Convention, the Convention Relating to the Distribution of Programme-Carrying Signals Transmitted by Satellite, the International Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organizations, the UPOV Convention (1978), the UPOV Convention (1991) or the Treaty on Intellectual Property in Respect of Integrated Circuits adopted at Washington in 1989, as if each Party were a Party to those Conventions, and with respect to intellectual property rights that are not the subject of these Conventions, "national of a Party" shall be understood at least to include any person that is  a citizen or  permanent resident of that Party.

6.    "public" includes, with respect to rights of communication and performance of works provided for under Articles 11, 11*bis*(1) and 14(1)(ii) of the Berne Convention, with respect to dramatic, dramatico-musical, musical and cinematographic works, at least, any aggregation of individuals intended to be the object of, and capable of perceiving, communications or performances of works, regardless of whether they can do so at the same or different times or in the same or different places, provided that such an aggregation is larger than a family and its immediate circle of acquaintances or is not a group comprising

-11-

a limited number of individuals having similarly close ties that has not been formed for the principal purpose of receiving such performances and communications of works.

7.     "right holder" includes the right holder personally, any other natural or legal person authorized by the right holder who is an exclusive licensee of the right, or other authorized persons, including federations and associations, having legal standing under domestic law to assert such rights.

## Article 3
## National Treatment

1.     Each Party shall accord to nationals of the other Party treatment no less favorable than it accords to its own nationals with regard to the acquisition, protection, enjoyment and enforcement of all intellectual property rights and any benefits derived therefrom.

2.     A Party shall not, as a condition of according national treatment under this Article, require right holders to comply with any formalities or conditions (including fixation, publication or exploitation in the territory of a Party) in order to acquire, enjoy, enforce and exercise rights or benefits in respect of copyright and related rights.

3.     A Party may derogate from paragraph 1 in relation to its judicial and administrative procedures for the protection or enforcement of intellectual property rights, including any procedure requiring a national of the other Party to designate for service of process an address in the Party's territory or to appoint an agent in the Party's territory, if the derogation is consistent with the relevant Convention listed in Article 1.3 above, provided that such derogation:

     A.     is necessary to secure compliance with measures that are not inconsistent with this Agreement; and

     B.     is not applied in a manner that would constitute a restriction on trade.

4.     No Party shall have any obligation under this Article with respect to procedures provided in multilateral agreements concluded under the auspices of the World Intellectual Property Organization relating to the acquisition or maintenance of intellectual property rights.

## Article 4
## Copyright and Related Rights

1.     Each Party shall protect all works that embody original expression within the meaning of the Berne Convention.  In particular:

-12-

      A.     all types of computer programs are literary works within the meaning of the Berne Convention and each Party shall protect them as such; and

      B.     compilations of data or other material, whether in machine readable or other form, which by reason of the selection or arrangement of their contents constitute intellectual creations, shall be protected as works.

The protection a Party provides under subparagraph (B) shall not extend to the data or material itself, or prejudice any copyright subsisting in that data or material.

2.     Each Party shall provide to authors and their successors in interest those rights enumerated in the Berne Convention in respect of works covered by paragraph 1, and shall provide the right to authorize or prohibit:

      A.     the importation into the Party's territory of copies of the work;

      B.     the first public distribution of the original and each copy of the work by sale, rental or otherwise;

      C.     the communication of a work to the public; and

      D.     the rental of the original or a copy of a computer program for the purposes of commercial advantage.

Subparagraph (D) shall not apply where the copy of the computer program is not itself an essential object of the rental.  Each Party shall provide that putting the original or a copy of a computer program on the market with the right holder's consent shall not exhaust the rental right.

3.     Each Party shall provide that for copyright and related rights:

      A.     any person acquiring or holding any economic rights may freely and separately transfer such rights by contract; and

      B.     any person acquiring or holding any such economic rights by virtue of a contract, including contracts of employment  underlying the creation of works and sound recordings, shall be able to exercise those rights in its own name and enjoy fully the benefits derived from those rights.

4.     Each Party shall provide that, where the term of protection of a work is to be calculated on a basis other than the life of a  natural person, the term shall be not less than 75 years from the end of the calendar year of the first authorized publication of the work or, failing such

-13-

authorized publication within 25 years from the creation of the work, not less than 100 years from the end of the calendar year of the creation of the work.

5.    Neither Party may grant translation or reproduction licenses permitted under the Appendix to the Berne Convention where legitimate needs in that Party's territory for copies or translations of the work could be met by the right holder's voluntary actions but for obstacles created by the Party's measures.

6.    Each Party shall provide to the right holder in a sound recording the right to authorize or prohibit:

    A.    the direct or indirect reproduction, in whole or in part, of the sound recording;

    B.    the importation into the Party's territory of copies of the sound recording;

    C.    the first public distribution of the original and each copy of the sound recording by sale, rental or otherwise; and

    D.    the rental, lease or lending of the original or a copy of the sound recording for the purposes of commercial advantage.

Each Party shall provide that putting the original or a copy of a sound recording on the market with the right holder's consent shall not exhaust the rental right.

7.    Each Party shall provide to performers the right to authorize or prohibit:

    A.    the fixation of their live musical performances in a sound recording;

    B.    the reproduction of unauthorized fixations of their live musical performances in a sound recording;

    C.    the transmission or other communication to the public of sounds in a live musical performance; and

    D.    the distribution, sale, rental, disposal or transfer of the unauthorized fixations of their live performances in a sound recording, regardless of where the fixations were made.

8.    Each Party shall, through operation of this Agreement, apply the provisions of Article 18 of the Berne Convention to works and, with such modifications as may be necessary, to existing sound recordings.

-14-

9.  Each Party shall confine limitations or exceptions to the rights provided for in this Article to certain special cases that do not conflict with a normal exploitation of the work, and do not unreasonably prejudice the legitimate interests of the right holder.

**Article 5**
**Protection of Encrypted Program-Carrying Satellite Signals**

1.  For serious violations involving the protection of encrypted program-carrying satellite signals, each Party shall make available appropriate remedies, including civil and criminal remedies.

2.  Serious violations involving the protection of encrypted program-carrying satellite signals shall include the following:

    A.  The manufacture, assembly, modification, or distribution (including import, export, sale or lease) of a device or system, by any person knowing or having reason to know that the device or system is primarily of assistance in the unauthorized decoding of an encrypted program-carrying satellite signal; and

    B.  The willful receipt or further distribution of an encrypted program-carrying satellite signal that has been decoded without the authorization of the lawful distributor of the signal (regardless of the location of such person) or of any other person or persons designated by the original transmitter as authorized distributors of such signal in such Party.

3.  Each Party shall provide that civil remedies provided for pursuant to paragraph 1 of this Article shall be available to any person that holds an interest in the encrypted program-carrying satellite signal or the content thereof.

**Article 6**
**Trademarks**

1.  For the purposes of this Agreement, a trademark consists of any sign, or any combination of signs, capable of distinguishing the goods or services of one person from those of another, including words, personal names, designs, letters, numerals, combinations of colors, figurative elements or the shape of goods or of their packaging. Trademarks shall include service marks, collective marks and certification marks.

2.  Each Party shall provide to the owner of a registered trademark the right to prevent all persons not having the owner's consent from using in commerce identical or similar signs for goods or services that are identical, or similar to those goods or services in respect of

-15-

which the owner's trademark is registered, where such use would result in a likelihood of confusion.  In the case of the use of an identical sign for identical goods or services, a likelihood of confusion shall be presumed.  The rights described above shall not prejudice any prior rights, nor shall they affect the possibility of making rights available on the basis of use.

3.    A Party may make registrability depend on use.  However, actual use of a trademark shall not be a condition for filing an application for registration.  Neither Party may refuse an application solely on  the ground that intended use has not taken place before the expiry of a period of three years from the date of application for registration.

4.    Each Party shall provide a system for the registration of trademarks, which shall include:

> A.    examination of applications;

> B.    notice to be given to an applicant of the reasons for the refusal to register a trademark;

> C.    a reasonable opportunity for the applicant to respond to the notice;

> D.    publication of each  trademark either  before or  promptly after  it is registered; and

> E.    a reasonable opportunity for interested persons to petition to cancel the registration of a trademark.

5.    The nature of the goods or services to which a trademark is to be applied shall in no case form an obstacle to the registration of a trademark.

6.    Article *6bis* of the Paris Convention shall apply, with such modifications as may be necessary, to services.  In determining whether a trademark is well-known, account shall be taken of the knowledge of the trademark in the relevant sector of the public, including knowledge in the Party's territory obtained as a result of the promotion of the trademark.  Neither Party may require that the reputation of the trademark extend beyond the sector of the public that normally deals with the relevant goods or services or that the trademark be registered.

7.    Each Party shall use the International Classification of Goods and Services for registration.  Neither Party shall use such classification as the only basis for determining the likelihood of confusion.

8.    Each Party shall provide that the initial registration of a trademark be for a term of at least 10 years, and that the registration be indefinitely renewable for terms of not less than 10 years when conditions for renewal have been met.

9.      Each Party shall require the use of a trademark to maintain a registration. The registration may be canceled for the reason of non-use only after an uninterrupted period of at least three years of non-use, unless valid reasons based on the existence of obstacles to such use are shown by the trademark owner. The law shall recognize, as valid reasons for non-use, circumstances arising independently of the will of the trademark owner that constitute an obstacle to the use of the trademark, such as import restrictions on, or other government requirements for, goods or services identified by the trademark.

10.     Each Party shall recognize the use of a trademark by a person other than the trademark owner, where such use is subject to the owner's control, as use of the trademark for purposes of maintaining the registration.

11.      Neither Party may encumber the use of a trademark in commerce by special requirements, such as a use that reduces the trademark's function as an indication of source or a use with another trademark.

12.     A Party may determine conditions on the licensing and assignment of trademarks, it being understood that the compulsory licensing of trademarks shall not be permitted. The owner of a registered trademark shall have the right to assign its trademark with or without the transfer of the business to which the trademark belongs. However, a Party may require a transfer of goodwill in a mark as part of a valid transfer of the mark.

13.     A Party may provide limited exceptions to the rights conferred by a trademark, such as fair use of descriptive terms, provided that such exceptions take into account the legitimate interests of the trademark owner and of other persons.

14.     A Party may refuse to register trademarks that consist of or comprise immoral, deceptive or scandalous matter, or matter that may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs or a Party's national symbols, or bring them into contempt or disrepute. Each Party shall prohibit the registration as a trademark of words that generically designate goods or services or types of goods or services to which the trademark applies.

## Article 7
## Patents

1.      Subject to the provision of paragraph 2 of this Article, each Party shall make patents available for any invention, whether a product or process, in all fields of technology, provided that such invention is new, resulted from an inventive step and is capable of industrial application. For purposes of this Article, a Party may deem the terms "inventive step" and "capable of industrial application" to be synonymous with the terms "non-obvious" and "useful", respectively.

-17-

2.  Parties may exclude from patentability:

    A.  inventions, the prevention within their territory of the commercial exploitation of which is necessary to protect public order or morality, including to protect human, animal or plant life or health or to avoid serious prejudice to the environment, provided that such exclusion is not made merely because the exploitation is prohibited by their law;

    B.  diagnostic, therapeutic and surgical methods for the treatment of humans or animals;

    C.  essentially biological processes for the production of plants or animals other than non-biological and microbiological processes; animal varieties; plant varieties.  The exclusion for plant varieties is limited to those plant varieties that satisfy the definition provided in Article 1(vi) of the UPOV Convention (1991); such definition shall apply *mutatis mutandis* to animal varieties.  The exclusions for plant and animal varieties shall not apply to plant or animal inventions that could encompass more than one variety.  Moreover, the Parties shall provide for the protection of plant varieties by an effective *sui generis* system in accordance with subparagraph 3.D of Article 1 of this Chapter.

3.  Each Party shall provide that:

    A.  where the subject matter of a patent is a product, the patent shall confer on the patent owner the right to prevent other persons from making, using, selling, offering for sale or importing for these purposes the subject matter of the patent, without the patent owner's consent; and

    B.  where the subject matter of a patent is a process, the patent shall confer on the patent owner the right to prevent other persons from using that process and from using, selling, offering for sale or importing for these purposes at least the product obtained directly by that process, without the patent owner's consent.

4.  A Party may provide limited exceptions to the exclusive rights conferred by a patent, provided that such exceptions do not conflict with a normal exploitation of the patent and do not unreasonably prejudice the legitimate interests of the patent owner.

5.  Patents shall be available and patent rights enjoyable without discrimination as to the field of technology or whether products are imported or locally produced.

6.  A Party may revoke a patent only when grounds exist that would have justified a refusal to grant the patent.

-18-

7. Each Party shall permit patent owners to assign and transfer by succession their patents, and to conclude licensing contracts.

8. A Party may decline to allow use without the authorization of the right holder of a patent. However, where the law of a Party allows for use of the subject matter of a patent, other than use allowed under paragraph 4, without the authorization of the right holder, including use by the government or other persons authorized by the government, the Party shall respect the following provisions:

A. authorization of such use shall be considered on its individual merits;

B. such use may be permitted only if, prior to such use, the proposed user has made efforts to obtain authorization from the right holder on reasonable commercial terms and conditions and such efforts have not been successful within a reasonable period of time. The requirement to make such efforts may be waived by a Party in the case of a national emergency or other circumstances of extreme urgency or in cases of public non-commercial use. In situations of national emergency or other circumstances of extreme urgency, the right holder shall, nevertheless, be notified as soon as reasonably practicable. In the case of public non-commercial use, where the government or contractor, without making a patent search, knows or has demonstrable grounds to know that a valid patent is or will be used by or for the government, the right holder shall be informed promptly;

C. the scope and duration of such use shall be limited to the purpose for which it was authorized, and in the case of semiconductor technology shall only be for public non-commercial use or to remedy a practice determined after judicial or administrative process to be anti-competitive;

D. such use shall be non-exclusive;

E. such use shall be non-assignable, except with that part of the enterprise or goodwill that enjoys such use;

F. any such use shall be authorized predominantly for the supply of the Party's domestic market;

G. authorization for such use shall be liable, subject to adequate protection of the legitimate interests of the persons so authorized, to be terminated if and when the circumstances that led to it cease to exist and are unlikely to recur. The competent authority shall have the authority to review, on petition of an interested party, the continued existence of these circumstances;

-19-

H.     the right holder shall be paid adequate remuneration in the circumstances of each case, taking into account the economic value of the authorization;

I.     the legal validity of any decision relating to the authorization shall be subject to judicial or other independent review by a distinct higher authority;

J.     any decision relating to the remuneration provided in respect of such use shall be subject to judicial or other independent review by a distinct higher authority;

K.     the Party shall not be obliged to apply the conditions set out in subparagraphs B and F of this Article where such use is permitted to remedy a practice determined after judicial or administrative process to be anticompetitive.  The need to correct anti-competitive practices may be taken into account in determining the amount of remuneration in such cases.  Competent authorities shall have the authority to refuse termination of authorization if and when the conditions that led to such authorization are likely to recur; and

L.     the Party shall not authorize the use of the subject matter of a patent to permit the exploitation of another patent except as a remedy for an adjudicated violation of domestic laws regarding anticompetitive practices.

9.     Where the subject matter of a patent is a process for obtaining a product, each Party shall, in any infringement proceeding, place on the defendant the burden of establishing that the allegedly infringing product was made by a process other than the patented process in one or more of the following situations:

A.     the product obtained by the patented process is new; or

B.     a substantial likelihood exists that the allegedly infringing product was made by the process and the patent owner has been unable through reasonable efforts to determine the process actually used.

In the gathering and evaluation of evidence, the legitimate  interests of the defendant in protecting its trade secrets shall be taken into account.

10.     Each Party shall provide a term of protection for patents that shall not end before the expiration of a period of twenty years counted from the date of filing.  A Party may extend the term of patent protection, in appropriate cases, to compensate for delays caused by regulatory approval processes.

-20-

**Article 8**
**Layout Designs (Topographies) of Integrated Circuits**

1.      Each Party shall protect layout designs (topographies) of integrated circuits ("layout designs") in accordance with Articles 2 through 7, 12 and 16(3), other than Article 6(3), of the Treaty on Intellectual Property in Respect of Integrated Circuits as opened for signature on May 26, 1989, and, in addition, shall comply with the provisions of paragraphs 2 through 8 of this Article.

2.      Subject to paragraph 3, each Party shall make it unlawful for any person without the right holder's authorization to reproduce, import or distribute a protected layout design, an integrated circuit in which a protected layout design is incorporated, or an article incorporating such an integrated circuit only insofar as it continues to contain an unlawfully reproduced layout design.

3.      Neither Party may make unlawful any of the acts referred to in paragraph 2 performed in respect of an integrated circuit that incorporates an unlawfully reproduced layout design, or any article that incorporates such an integrated circuit, where the person performing those acts or ordering those acts to be done did not know and had no reasonable ground to know, when it acquired the integrated circuit or article incorporating such an integrated circuit, that it incorporated an unlawfully reproduced layout design.

4.      Each Party shall provide that, after the person referred to in paragraph 3 has received sufficient notice that the layout design was unlawfully reproduced, such person may perform any of the acts with respect to the stock on hand or ordered before such notice, but shall be liable to pay the right holder for doing so an amount equivalent to a reasonable royalty such as would be payable under a freely negotiated license in respect of such a layout design.

5.      Neither Party may permit the compulsory licensing of layout designs of integrated circuits.

6.      Any Party that requires registration as a condition for protection of a layout design shall provide that the term of protection shall not end before the expiration of a period of 10 years counted from the date of filing an application for registration or from the date on which the layout design is first commercially exploited in the world, whichever occurs first.

7.      Where a Party does not require registration as a condition for protection of a layout design, the Party shall provide a term of protection of not less than 10 years from the date of the first commercial exploitation of the layout design, wherever in the world it occurs.

8.      Notwithstanding paragraphs 6 and 7, a Party may provide that the protection shall lapse 15 years after the creation of the layout design.

**Article 9**
**Confidential Information (Trade Secrets)**

1.  In the course of ensuring effective protection against unfair competition as provided in Article 10*bis* of the Paris Convention (1967), each Party shall protect confidential information in accordance with paragraph 2 below and data submitted to government or governmental agencies in accordance with paragraphs 5 and 6 below.

2.  Each Party shall provide the legal means for any person to prevent confidential information from being disclosed to, acquired by, or used by others without the consent of the person lawfully in control of the information in a manner contrary to honest commercial practices, in so far as, and for so long as:

    A.   the information is not generally known or readily ascertainable;

    B.   the information has commercial value because it is secret; and

    C.   the person lawfully in control of the information has taken reasonable steps under the circumstances to keep it secret.

3.  For the purposes of this Agreement, "in a manner contrary to honest commercial practices" shall mean at least practices such as breach of contract, breach of confidence and inducement to breach, and includes the acquisition of undisclosed information by third parties who knew, or were negligent in failing to know, that such practices were involved in the acquisition.

4.  Neither Party may discourage or impede the voluntary licensing of confidential information by imposing excessive or discriminatory conditions on such licenses or conditions that dilute the value of the confidential information.

5.  If a Party requires, as a condition for approving the marketing of pharmaceutical or agrochemical products, the submission of undisclosed test or other data, the origination of which involves a considerable effort, the Party shall protect such data against unfair commercial use.  In addition, each Party shall protect such data against disclosure, except where necessary to protect the public.

6.  Each Party shall provide that for data of a type referenced in paragraph 5 that are submitted to the Party after the date of entry into force of this Agreement, no other applicant for product approval may, without permission of the person that submitted them, rely on that data in support of an application for product approval during a reasonable period of time after their submission.  For this purpose, a reasonable period shall normally mean not less than five years from the date on which the Party granted approval to the person that

produced the data for approval to market its product, taking into account the nature of the data and the person's efforts and expenditures in producing them.

## Article 10
## Industrial Designs

1.    Each Party shall provide for the protection of independently created industrial designs that are new or original.  A Party may provide that:

      A.    designs are not new or original if they do not significantly differ from known designs or combinations of known design features; and

      B.    such protection shall not extend to designs dictated essentially by technical or functional considerations.

2.    Each Party shall ensure that the requirements for securing protection for textile designs, in particular in regard to any cost, examination or publication, do not unreasonably impair a person's opportunity to seek and obtain such protection.  A Party may comply with this obligation through industrial design law or copyright law.

3.    Each Party shall provide the owner of a protected industrial design the right to prevent other persons not having the owner's consent from making, selling, importing or otherwise distributing articles bearing or embodying a design that is a copy, or substantially a copy, of the protected design, when such acts are undertaken for commercial purposes.

4.    A Party may provide limited exceptions to the protection of industrial designs, provided that such exceptions do not conflict with the normal exploitation of protected industrial designs and do not unreasonably prejudice the legitimate interests of the owner of the protected design.

5.    Each Party shall provide a term of protection for industrial designs available for the  amount of at least 10 years.

## Article 11
## Enforcement of Intellectual Property Rights

1.    As specified in this Article and Articles 12 through 15 hereof, each Party shall provide procedures in its domestic law that permit effective action against infringement of the intellectual property rights covered by this Chapter.  These procedures shall include expeditious remedies to prevent infringement and remedies substantial enough to deter

-23-

future infringement.  Each Party shall apply enforcement procedures in a manner that does not create barriers to legitimate trade and contains effective safeguards against abuse.

2.      Each Party shall ensure that its enforcement procedures are fair and equitable, are not unnecessarily complicated or costly, and do not entail unreasonable time limits or unwarranted delays.

3.      Each Party shall ensure that decisions on the merits of a case in judicial and administrative enforcement proceedings are:

   A.      in writing and state the reasons on which the decisions are based;

   B.      made available without undue delay at least to the parties in a proceeding; and

   C.      based only on evidence in respect of which such parties were offered the opportunity to be heard.

4.      Each Party shall ensure that parties in a proceeding have an opportunity to have final administrative decisions reviewed by a judicial authority of that Party and, subject to jurisdictional provisions in its domestic laws concerning the importance of a case, to have reviewed at least the legal aspects of initial judicial decisions on the merits of a case. Notwithstanding the above, neither Party shall be required to provide for judicial review of acquittals in criminal cases.

### Article 12
### Specific Procedural and Remedial Aspects of Civil
### and Administrative Procedures

1.      Each Party shall make available to right holders civil judicial procedures for the enforcement of any intellectual property right covered by this Agreement.  Each Party shall provide that:

   A.      defendants have the right to written notice that is timely and contains sufficient detail, including the basis of the claims;

   B.      parties in a proceeding are allowed to be represented by independent legal counsel;

   C.      enforcement procedures do not include imposition of overly burdensome requirements concerning mandatory personal appearances;

   D.      all parties in a proceeding are duly entitled to substantiate their claims and to present relevant evidence; and

E.      the procedures include a means to identify and protect confidential information.

2.      Each Party shall authorize its judicial authorities:

A.      where a party in a proceeding has presented reasonably available evidence sufficient to support its claims and has specified evidence relevant to the substantiation of its claims that is within the control of the opposing party, to order the opposing party to produce such evidence, subject in appropriate cases to conditions that ensure the protection of confidential information;

B.      where a party in a proceeding voluntarily and without good reason refuses access to, or otherwise does not provide relevant evidence under that party's control within a reasonable period, or significantly impedes a proceeding relating to an enforcement action, to make preliminary and final determinations, affirmative or negative, on the basis of the evidence presented, including the complaint or the allegation presented by the party adversely affected by the denial of access to evidence, subject to providing the parties an opportunity to be heard on the allegations or evidence;

C.      to order a party in a proceeding to desist from an infringement, including measures to prevent the entry into the channels of commerce of imported goods that involve the infringement of an intellectual property right, immediately after customs clearance of such goods.

D.      to order the infringer of an intellectual property right to pay the right holder damages adequate to compensate for the injury the right holder has suffered because of the infringement and the profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages;

E.      to order an infringer of an intellectual property right to pay the right holder's expenses, which may include appropriate attorney's fees; and

F.      to order a party in a proceeding at whose request measures were taken and who has abused enforcement procedures to provide adequate compensation to any party wrongfully enjoined or restrained in the proceeding for the injury suffered because of such abuse and to pay that party's expenses, which may include appropriate attorney's fees.

3.      With respect to the authority referred to in subparagraph 2.D, a Party shall, at least with respect to works protected by copyright or neighboring rights, provide judicial authorities with the authority to order the payment of pre-established damages.  Judicial authorities shall exercise such authority at their discretion.

4.      Each Party shall, in order to create an effective deterrent to infringement and counterfeiting, authorize its judicial authorities to order that:

      A.      goods that they have found to be infringing be, without compensation of any sort, disposed of outside the channels of commerce in such a manner as to avoid any injury caused to the right holder or, unless this would be contrary to existing constitutional requirements, destroyed; and

      B.      materials and implements the predominant use of which has been in the creation of the infringing goods be, without compensation of any sort, disposed of outside the channels of commerce in such a manner as to minimize the risks of further infringements.

In considering whether to issue such an order, judicial authorities shall take into account the need for proportionality between the seriousness of the infringement and the remedies ordered, as well as the interests of other persons.  In regard to counterfeit trademark goods, the simple removal of the trademark unlawfully affixed shall not be sufficient, other than in exceptional cases, to permit release of the goods into the channels of commerce.

5.      In respect of the administration of any law pertaining to the protection or enforcement of intellectual property rights, each Party may exempt public authorities and officials from liability, unless their actions were not taken or intended in good faith in the course of the administration of such laws.

6.      Notwithstanding the other provisions of Articles 11 through 15 of this Chapter, in any case of infringement of an intellectual property right brought against a Party to this Agreement, remedies available against that Party may be limited to the payment to the right holder of adequate remuneration in the circumstances of each case, taking into account the economic value of the use.

7.      Each Party shall provide that, where a civil remedy can be ordered as a result of administrative procedures on the merits of a case, such procedures shall conform to principles equivalent in substance to those set out in this Article.

## Article 13
## Provisional Measures

1.      Each Party shall authorize its judicial authorities to order prompt and effective provisional measures:

      A.      to prevent an infringement of any intellectual property right, and in particular to prevent the entry into the channels of commerce in their jurisdiction of allegedly

infringing goods, including imported goods immediately after customs clearance; and

    B.    to preserve relevant evidence in regard to the alleged infringement.

2.    Each Party shall authorize its judicial authorities to require any applicant for provisional measures to provide to the judicial authorities any evidence reasonably available to that applicant that the judicial authorities consider necessary to enable them to determine with a sufficient degree of certainty whether:

    A.    the applicant is the right holder;

    B.    the applicant's right is being infringed or such infringement is imminent; and

    C.    any delay in the issuance of such measures is likely to cause irreparable harm to the right holder, or there is a demonstrable risk of evidence being destroyed.

Each Party shall authorize its judicial authorities to require the applicant to provide a security or equivalent assurance sufficient to protect the interests of the defendant and to prevent abuse.

3.    Each Party shall authorize its judicial authorities to require an applicant for provisional measures to provide other information necessary for the identification of the relevant goods by the authority that will execute the provisional measures.

4.    Each Party shall authorize its judicial authorities to order provisional measures on an *ex parte* basis, in particular where any delay is likely to cause irreparable harm to the right holder, or where there is a demonstrable risk of evidence being destroyed.

5.    Each Party shall authorize that where provisional measures are adopted by that Party's judicial authorities on an *ex parte* basis:

    A.    a person affected shall be given notice of those measures without delay but in any event no later than immediately after the execution of the measures;

    B.    a defendant shall, on request, have those measures reviewed by that Party's judicial authorities for the purpose of deciding, within a reasonable period after notice of those measures is given, whether the measures shall be modified, revoked or confirmed, and shall be given an opportunity to be heard in the review proceedings.

6.    Without prejudice to paragraph 5, each Party shall provide that, on the request of the defendant, the Party's judicial authorities shall revoke or otherwise cease to apply the

-27-

provisional measures taken on the basis of paragraphs 1 and 4 if proceedings leading to a decision on the merits are not initiated:

    A.    within a reasonable period as determined by the judicial authority ordering the measures where the Party's domestic law so permits; or

    B.    in the absence of such a determination, within a period of no more than 20 working days or 31 calendar days, whichever is longer.

7.    Each Party shall authorize its judicial authorities to order, on request of the defendant, that the applicant provide compensation for injury caused by provisional measures:

    A.    if the provisional measures are revoked or lapse because of any act or omission of the applicant, or

    B.    if the judicial authorities subsequently find there has been no infringement or threat of infringement of any intellectual property right.

8.    Each Party shall provide that, where a provisional measure can be ordered as a result of administrative procedures, such procedures shall conform to principles equivalent in substance to those set out in this Article.

## Article 14
## Criminal Procedures and Penalties

1.    Each Party shall provide criminal procedures and penalties to be applied at least in cases of willful trademark counterfeiting or infringement of copyrights or neighboring rights on a commercial scale.  Each Party shall provide that penalties available include imprisonment or monetary fines, or both, sufficient to provide a deterrent, consistent with the level of penalties applied for crimes of a corresponding gravity.

2.    Each Party shall provide that, in appropriate cases, its judicial authorities may order the seizure, forfeiture and destruction of infringing goods and of any materials and implements the predominant use of which has been in the commission of the offense.

3.    Each Party may provide that, in appropriate cases, its judicial authorities may impose criminal penalties for the infringement of intellectual property rights other than those in paragraph 1 of this Article, where they are committed wilfully and on a commercial scale.

**Article 15**
**Enforcement of Intellectual Property Rights at the Border**

1.       Each Party shall adopt procedures to enable a right holder, who has valid grounds for suspecting that the importation of counterfeit trademark goods or unauthorized copies of works protected by copyrights or neighboring rights may take place, to lodge an application in writing with its competent authorities, whether administrative or judicial, for the suspension by the customs administration of the release of such goods into free circulation. No Party shall be obligated to apply such procedures to goods in transit.  A Party may permit such an application to be made in respect of goods that involve other infringements of intellectual property rights, provided that the requirements of this Article are met.  A Party may also provide for corresponding procedures concerning the suspension by the customs administration of the release of infringing goods destined for exportation from its territory.

2.       Each Party shall require any applicant who initiates procedures under paragraph 1 to provide adequate evidence:

   A.       to satisfy that Party's competent authorities that, under its domestic laws, there is *prima facie* an infringement of its intellectual property right; and

   B.       to supply a sufficiently detailed description of the goods to make them readily recognizable by the customs administration.

The competent authorities shall inform the applicant within a reasonable period whether they have accepted the application and, if so, the period for which the customs administration will take action.

3.       Each Party shall authorize its competent authorities to require an applicant under paragraph 1 to provide a security or equivalent assurance sufficient to protect the defendant and the competent authorities and to prevent abuse. Such security or equivalent assurance shall not unreasonably deter recourse to these procedures.

4.       A Party's customs administration, upon receiving an application pursuant to procedures adopted in accordance with this Article, may suspend the release of goods involving industrial designs, patents, integrated circuits or trade secrets into free circulation on the basis of a decision other than by a judicial or other independent authority; provided, however, if the period set forth in paragraphs 6 through 8 has expired without the granting of provisional relief by the duly empowered authority, and provided that all other conditions for importation have been complied with, such Party shall permit the owner, importer or consignee of such goods to receive such goods for entry into commerce on the posting of a security in an amount sufficient to protect the right holder against any infringement. Payment of such security shall not prejudice any other remedy available to the right holder,

-29-

it being understood that the security shall be released if the right holder fails to pursue its right of action within a reasonable period of time.

5.    Each Party shall ensure that its customs administration will promptly notify the importer and the applicant when the customs administration suspends the release of goods pursuant to paragraph 1.

6.    Each Party shall ensure that its customs administration will release goods from suspension if within a period not exceeding 10 working days after the applicant under paragraph 1 has been served notice of the suspension the customs administration has not been informed that:

   A.    a party other than the defendant has initiated proceedings leading to a decision on the merits of the case, or

   B.    a competent authority has taken provisional measures prolonging the suspension, provided that all other conditions for importation or exportation have been met. Each Party shall provide that, in appropriate cases, the customs administration may extend the suspension by another 10 working days.

7.    Each Party shall ensure that if proceedings leading to a decision on the merits of the case have been initiated, a review, including a right to be heard, shall take place on request of the defendant with a view to deciding, within a reasonable period, whether the measures shall be modified, revoked or confirmed.

8.    Notwithstanding paragraphs 6 and 7, where the suspension of the release of goods is carried out or continued in accordance with a provisional judicial measure, Article 13.6 of this Chapter shall apply.

9.    Each Party shall ensure that its competent authorities have the authority to order the applicant under paragraph 1 to pay the importer, the consignee and the owner of the goods appropriate compensation for any injury caused to them through the wrongful detention of goods or through the detention of goods released pursuant to paragraph 6.

10.   Without prejudice to the protection of confidential information, each Party shall ensure that its competent authorities have the authority to give the right holder sufficient opportunity to have any goods detained by the customs administration inspected in order to substantiate its claims. Each Party shall also ensure that its competent authorities have the authority to give the importer an equivalent opportunity to have any such goods inspected. Where the competent authorities have made a positive determination on the merits of a case, a Party may provide the competent authorities the authority to inform the right holder of the names and addresses of the consignor, the importer and the consignee, and of the quantity of the goods in question.

-30-

11.    Where a Party requires its competent authorities to act on their own initiative and to suspend the release of goods in respect of which they have acquired *prima facie* evidence that an intellectual property right is being infringed:

    A.    The competent authorities may at any time seek from the right holder any information that might assist them to exercise these powers;

    B.    the importer and the right holder shall be promptly notified of the suspension by the Party's competent authorities, and where the importer lodges an appeal against the suspension with competent authorities, the suspension shall be subject to the conditions, with such modifications as may be necessary, set out in paragraphs 6 through 8; and

    C.    the Party may exempt public authorities and officials from liability, except when the offending actions were not taken or intended in good faith.

12.    Without prejudice to other rights of action open to the right holder and subject to the defendant's right to seek judicial review, each Party shall provide that its competent authorities shall have the authority to order the destruction or disposal of infringing goods in accordance with the principles set out in Article 12.4 of this Chapter.  In regard to counterfeit trademark goods, the authorities shall not allow the re-exportation of the infringing goods in an unaltered state or subject them to a different customs procedure, other than in exceptional circumstances.

13.    A Party may exclude from the application of paragraphs 1 through 12 small quantities of goods of a non-commercial nature contained in travelers' personal luggage or sent in small consignments that are not repetitive.

**Article 16**
**Existing Subject Matter**

To the extent this Agreement requires a Party to increase its level of protection and enforcement of intellectual property rights, it gives rise to obligations in respect of all subject matter existing at the date of application of this Agreement for the Party in question, and which is protected in that Party on the date the Agreement enters into force, or which meets or comes subsequently to meet the criteria for protection under the terms of this Agreement.  In respect of this Article, copyright obligations with respect to existing works shall be solely determined under Article 18 of the Berne Convention (1971), and obligations with respect to the rights of producers of phonograms and performers in existing phonograms shall be determined solely under Article 18 of the Berne Convention (1971), which is applied with such modifications as may be necessary.

-31-

**Article 17**
**Technical Cooperation**

1.      The Parties agree to enhance mutually beneficial cooperation in the field of intellectual property rights.  To this end, the United States agrees to provide Vietnam with technical assistance to strengthen its regime for the protection and enforcement of intellectual property rights.  Such technical assistance shall be provided on mutually agreed terms and is subject to the availability of appropriated funds.  This assistance may be provided through, or in conjunction with, private industry or international organizations.

2.      Cooperative activities under this Article may be undertaken in the fields of intellectual property described in Article 2.3 of this Chapter as well as the enforcement of intellectual property rights.  Cooperative activities under this Article may include, but are not limited to, such activities as the exchange of experience and training of staff, and have the aim of strengthening the legislative and regulatory framework in the field of intellectual property law, strengthening the administration of intellectual property protection, and strengthening the implementation and effective enforcement of intellectual property laws in Vietnam.

3.      To assist in further strengthening its regime for the protection and enforcement of intellectual property rights, Vietnam agrees to seek appropriate technical assistance from relevant international organizations or other interested countries, organizations or agencies.

**Article 18**
**Transitional Provisions**

1.      Vietnam agrees to implement fully the obligations of this Chapter within the following time periods:

      A.      With respect to all obligations in Articles 6 and 7, twelve months from the date of entry into force of this Agreement.

      B.      With respect to all obligations in Article 4 except the obligation in Article 4.4, and with respect to all obligations in Article 9, eighteen months from the date of entry into force of this Agreement.

      C.      With respect to the obligations in Articles 1.3.A, 1.3.E, 4.4 and 5, thirty months from the date of entry into force of this Agreement.

      D.      With respect to all obligations not referenced in sub-paragraphs 1.A, 1.B or 1.C of this Article, twenty-four months from the date of entry into force of this Agreement.

2.    The United States agrees to implement fully the obligations of this Chapter upon entry into force of this Agreement, with the exception of the obligations in Article 8 and Article 3.1 as regards the protection of layout designs (topographies) of integrated circuits, which shall be implemented twenty-four months from the date of entry into force of this Agreement.

3.    Vietnam shall comply fully with the obligations of this Chapter which coincide with those of the WTO Agreement on Trade-Related Aspects of Intellectual Property Rights (1994) upon its accession to the WTO, if such accession occurs before the expiration of the time periods provided in paragraph 1 of this Article.

4.    Each Party shall immediately comply with the obligations of this Chapter to the extent possible under its existing laws, and shall not take any measures during the time periods provided in paragraphs 1 and 2 that would result in a lesser degree of consistency with this Chapter.

5.    In case of any conflict between the provisions of this Agreement and The Agreement between the Government of the United States of America and the Government of the Socialist Republic of Vietnam on the Establishment of Copyright Relations, signed in Hanoi on June 27, 1997, the provisions of this Agreement shall prevail to the extent of the conflict.

-33-

# CHAPTER III

# TRADE IN SERVICES

### Article 1
### Scope and Definition

1.      This Chapter applies to measures by the Parties affecting trade in services.

2.      For the purposes of this Chapter, trade in services is defined as the supply of a service:

      A.      from the territory of one Party into the territory of the other Party;

      B.      in the territory of one Party to the service consumer of the other Party;

      C.      by a service supplier of one Party, through commercial presence in the territory of the other Party;

      D.      by a service supplier of one Party, through presence of natural persons of a Party in the territory of the other Party.

3.      For the purposes of this Chapter:

      A.      "measures by a Party" means measures taken by:

            (i)  central, regional or local governments and authorities; and

            (ii)  non-governmental bodies in the exercise of powers delegated by central, regional or local governments or authorities;

In fulfilling its obligations and commitments under this Chapter, each Party shall take such reasonable measures as may be available to it to ensure their observance by regional and local governments and authorities and non-governmental bodies within its territory;

      B.      "services" includes any service in any sector except services supplied in the exercise of governmental authority;

      C.      "a service supplied in the exercise of governmental authority" means any service which is supplied neither on a commercial basis, nor in competition with one or more service suppliers.

-34-

**Article 2**
**Most-Favored-Nation Treatment**

1.    With respect to any measure covered by this Chapter, each Party shall accord immediately and unconditionally to services and service suppliers of the other Party treatment no less favorable than that it accords to like services and service suppliers of any other country.

2.    A Party may maintain a measure inconsistent with paragraph 1 provided that such a measure is listed in Listing of Article 2 Exemptions in Annex G.

3.    The provisions of this Chapter shall not be so construed as to prevent either Party from conferring or according advantages to adjacent countries in order to facilitate exchanges limited to contiguous frontier zones of services that are both locally produced and consumed.

**Article 3**
**Economic Integration**

1.    This Chapter shall not apply to advantages accorded by either Party by virtue of such Party's membership in, or having entered into, an agreement liberalizing trade in services between or among the parties to such an agreement, provided that such an agreement:

    A.    has substantial sectoral coverage,[2] and

    B.    provides for the absence or elimination of substantially all discrimination, in the sense of Article 7, between or among the parties, in the sectors covered under subparagraph (A), through:
        i)    elimination of existing discriminatory measures, and/or
        ii)    prohibition of new or more discriminatory measures,
        either at the entry into force of that agreement or on the basis of a reasonable time-frame, except for measures permitted under Articles 1, 2, and 3 of   Chapter VII.

2.    A service supplier of any Party that is a juridical person constituted under the laws of a party to an agreement referred to in paragraph 1 shall be entitled to treatment granted under such agreement, provided that it engages in substantive business operations in the territory of the parties to such agreement.

---

    [2]  This condition is understood in terms of number of sectors, volume of trade affected and modes of supply.  In order to meet this condition, agreements should not provide for the *a priori* exclusion of any mode of supply.

**Article 4**
**Domestic Regulation**

1.      In sectors where specific commitments are undertaken, each Party shall ensure that all measures of general application affecting trade in services are administered in a reasonable, objective and impartial manner.

2.      A.      Each Party shall maintain or institute as soon as practicable judicial, arbitral or administrative tribunals or procedures which provide, at the request of an affected service supplier, for the prompt review of, and where justified, appropriate remedies for, administrative decisions affecting trade in services.  Where such procedures are not independent of the agency entrusted with the administrative decision concerned, the Party shall ensure that the procedures in fact provide for an objective and impartial review.

        B.      The provisions of subparagraph A shall not be construed to require a Party to institute such tribunals or procedures where this would be inconsistent with its constitutional structure or the nature of its legal system.

3.      Where authorization is required for the supply of a service on which a specific commitment has been made, the competent authorities of a Party shall, within a reasonable period of time after the submission of an application considered complete under domestic laws and regulations, inform the applicant of the decision concerning the application.  At the request of the applicant, the competent authorities of the Party shall provide, without undue delay, information concerning the status of the application.

4.      A.      The Party shall not apply licensing and qualification requirements and technical standards that nullify or impair such specific commitments in a manner which:

                (i)      does not comply with the following criteria:

                        (a)      such requirements or standards shall be based on objective and transparent criteria, such as competence and the ability to supply the service;

                        (b)      such requirements or standards shall not be more burdensome than necessary to ensure the quality of the service;

                        (c)      in the case of licensing procedures, they shall not in themselves be a restriction on the supply of the service.

        (ii)      could not reasonably have been expected of that Party at the time the specific commitments in those sectors were made.

    B.      In determining whether a Party is in conformity with the obligation under sub-paragraph 4.A, account shall be taken of international standards of relevant international organizations[3] applied by that Party.

5.      In sectors where specific commitments regarding professional services are undertaken, each Party shall provide for adequate procedures to verify the competence of professionals of the other Party.

### Article 5
### Monopolies and Exclusive Service Suppliers

1.      Each Party shall ensure that any monopoly supplier of a service in its territory does not, in the supply of the monopoly service in the relevant market, act in a manner inconsistent with that Party's obligations under Article 2 and specific commitments.

2.      Where a Party's monopoly supplier competes, either directly or through an affiliated company, in the supply of a service outside the scope of its monopoly rights and which is subject to that Party's specific commitments, the Party shall ensure that such a supplier does not abuse its monopoly position to act in its territory in a manner inconsistent with such commitments.

3.      The provisions of this Article shall also apply to cases of exclusive service suppliers, where a Party, formally or in effect, (*a*) authorizes or establishes a small number of service suppliers and (*b*) substantially prevents competition among those suppliers in its territory.

---

[3] The term "relevant international organizations" refers to international bodies whose membership is open to the relevant bodies of at least all Members of the WTO.

**Article 6**
**Market Access**

1.     With respect to market access through the modes of supply identified in Article 1, each Party shall accord services and service suppliers of the other Party treatment no less favorable than that provided for under the terms, limitations and conditions agreed and specified in its Schedule in Annex G.[4]

2.     In sectors where market-access commitments are undertaken, the measures which a Party shall not maintain or adopt either on the basis of a regional subdivision or on the basis of its entire territory, unless otherwise specified in its Schedule, are defined as:

    A.    limitations on the number of service suppliers whether in the form of numerical quotas, monopolies, exclusive service suppliers or the requirements of an economic needs test;

    B.    limitations on the total value of service transactions or assets in the form of numerical quotas or the requirement of an economic needs test;

    C.    limitations on the total number of service operations or on the total quantity of service output expressed in terms of designated numerical units in the form of quotas or the requirement of an economic needs test;[5]

    D.    limitations on the total number of natural persons that may be employed in a particular service sector or that a service supplier may employ and who are necessary for, and directly related to, the supply of a specific service in the form of numerical quotas or the requirement of an economic needs test;

    E.    measures which restrict or require specific types of legal entity or joint venture through which a service supplier may supply a service; and

---

[4]  If a Party undertakes a market-access commitment in relation to the supply of a service through the mode of supply referred to in subparagraph 2(A) of Article 1 and if the cross-border movement of capital is an essential part of the service itself, that Party is thereby committed to allow such movement of capital.  If a Party  undertakes a market-access commitment in relation to the supply of a service through the mode of supply referred to in subparagraph 2(C) of Article 1, it is thereby committed to allow related transfers of capital into its territory.

[5]  Subparagraph 2(C) does not cover measures of a Party which limit inputs for the supply of services.

-38-

F.      limitations on the participation of foreign capital in terms of maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

## Article 7
## National Treatment

1.      In the sectors inscribed in its Schedule in Annex G, and subject to any conditions and qualifications set out therein, each Party shall accord to services and service suppliers of the other Party, in respect of all measures affecting the supply of services, treatment no less favorable than that it accords to its own like services and service suppliers.[6]

2.      A Party may meet the requirement of paragraph 1 by according to services and service suppliers of the other Party, either formally identical treatment or formally different treatment to that it accords to its own like services and service suppliers.

3.      Formally identical or formally different treatment shall be considered to be less favorable if it modifies the conditions of competition in favor of services or service suppliers of the Party compared to like services or service suppliers of the other Party.

## Article 8
## Additional Commitments

The Parties may negotiate commitments with respect to measures affecting trade in services not subject to scheduling under Articles 6 or 7, including those regarding qualifications, standards or licensing matters.  Such commitments shall be inscribed in a Party's Schedule.

## Article 9
## Schedules of Specific Commitments

1.      Each Party shall set out in Annex G the specific commitments it undertakes under Articles 6 and 7 of this Chapter.  With respect to sectors where such commitments are undertaken, such Annex shall specify:

A.      terms, limitations and conditions on market access;

---

[6]  Specific commitments assumed under this Article shall not be construed to require either Party to compensate for any inherent competitive disadvantages which result from the foreign character of the relevant services or service supplier.

     B.      conditions and qualifications on national treatment;

     C.      undertakings relating to additional commitments;

     D.      where appropriate the time-frame for implementation of such commitments; and

     E.      the date of entry into force of such commitments.

2.     Measures inconsistent with both Articles 6 and 7 shall be inscribed in the column relating to Article 6.  In this case the inscription will be considered to provide a condition or qualification to Article 7 as well.

3.     Schedules of specific commitments shall be annexed to this Chapter and shall form an integral part thereof.

## Article 10
## Denial of Benefits

A Party may deny the benefits of this Chapter:

1.     to the supply of a service, if it establishes that the service is supplied from or in the territory of a non-Party;

2.     in the case of the supply of a maritime transport service, if applicable, if it establishes that the service is supplied:

     A.      by a vessel registered under the laws of a non-Party, and

     B.      by a person which operates and/or uses the vessel in whole or in part but which is of a non-Party;

3.     to a service supplier that is a juridical person, if it establishes that it is not a service supplier of the other Party.

## Article 11
## Definitions

For the purpose of this Chapter and Annex G:

1.     "measure" means any measure by a Party, whether in the form of a law, regulation, rule, procedure, decision, administrative action, or any other form;

2.    "supply of a service" includes the production, distribution, marketing, sale and delivery of a service;

3.    "measures by a Party affecting trade in services" include measures in respect of

    A.    the purchase, payment or use of a service;

    B.    the access to and use of, in connection with the supply of a service, services which are required by a Party to be offered to the public generally;

    C.    the presence, including commercial presence, of persons of a Party for the supply of a service in the territory of another Party;

4.    "commercial presence" means any type of business or professional establishment, including through

    A.    the constitution, acquisition or maintenance of a juridical person, or

    B.    the creation or maintenance of a branch or a representative office,

within the territory of a Party for the purpose of supplying a service;

5.    "sector" of a service means,

    A.    with reference to a specific commitment, one or more, or all, subsectors of that service, as specified in a Party's Schedule,

    B.    otherwise, the whole of that service sector, including all of its subsectors;

6.    "service of the other Party" means a service which is supplied,

    A.    from or in the territory of that other Party, or in the case of maritime transport, by a vessel registered under the laws of that other Party, or by a person of that other Party which supplies the service through the operation of a vessel and/or its use in whole or in part; or

    B.    in the case of the supply of a service through commercial presence or through the presence of natural persons, by a service supplier of that other Party;

7.    "service supplier" means any person that supplies a service;[7]

---

     [7]  Where the service is not supplied directly by a juridical person but through other forms of commercial presence such as a branch or a representative office, the service supplier (i.e. the juridical

-41-

8.      "monopoly supplier of a service" means any person, public or private, which in the relevant market of the territory of a Party is authorized or established formally or in effect by that Party as the sole supplier of that service;

9.      "service consumer" means any person that receives or uses a service;

10.     "person" means either a natural person or a juridical person;

11.     "natural person of the other Party" means a natural person who resides in the territory of that other Party, and who under the law of that other Party:

   A.      is a national of that other Party; or

   B.      has the right of permanent residence in that other Party, in the case of a Party which:

      i)      does not have nationals; or

      ii)     accords substantially the same treatment to its permanent residents as it does to its nationals in respect of measures affecting trade in services;

12.     "juridical person" means any legal entity duly constituted or otherwise organized under applicable law, whether for profit or otherwise, and whether privately-owned or governmentally-owned, including any corporation, trust, partnership, joint venture, sole proprietorship or association;

13.     "juridical person of the other Party" means a juridical person which is either:

   A.      constituted or otherwise organized under the law of the other Party, and is engaged in substantive business operations in the territory of that Party; or

   B.      in the case of the supply of a service through commercial presence, owned or controlled by:

      i)      natural persons of that Party; or

      ii)     juridical persons of that other Party identified under subparagraph (i);

---

person) shall, nonetheless, through such presence be accorded the treatment provided for service suppliers under this Chapter.  Such treatment shall be extended to the presence through which the service is supplied and need not be extended to any other parts of the supplier located outside the territory where the service is supplied.

14.     a juridical person is:

    A.     "owned" by persons of a Party if more than 50 per cent of the equity interest in it is beneficially owned by persons of that Party;

    B.     "controlled" by persons of a Party if such persons have the power to name a majority of its directors or otherwise to legally direct its actions;

    C.     "affiliated" with another person when it controls, or is controlled by, that other person; or when it and the other person are both controlled by the same person;

15.     "company" means any entity constituted or organized under applicable law, whether or not for profit, and whether privately or governmentally owned or controlled, and includes a corporation, trust, partnership, sole proprietorship, branch, joint venture, association, or other organization;

16.     "enterprise" means a company.

**ANNEX F**

**ANNEX ON FINANCIAL SERVICES, ANNEX ON MOVEMENT
OF NATURAL PERSONS, ANNEX ON TELECOMMUNICATIONS,
AND TELECOMMUNICATIONS REFERENCE PAPER**

## Annex on Financial Services

The Parties agree that the Annex on Financial Services to the WTO Agreement on Trade in Services (GATS) is hereby incorporated into this Agreement by reference, *mutatis mutandis*, as if its provisions were fully set forth herein, with the exceptions of Paragraph 3 and Paragraph 4 of such Annex which shall not be so incorporated.

For greater clarity, the Parties understand that:
1.    References in the Annex on Financial Services to the GATS to "Member" and "Members" shall mean "Party" and "Parties," respectively, in this Agreement; and
2.    References in the Annex on Financial Services to the GATS to Article 1 of the GATS shall mean Article 1 of Chapter III of this Agreement.

## Annex on Movement of Natural Persons

The Parties agree that the Annex on the Movement of Natural Persons to the WTO Agreement on Trade in Services (GATS) is hereby incorporated into this Agreement by reference, *mutatis mutandis*, as if its provisions were fully set forth herein.

For greater clarity, the Parties understand that:
1.    References in the Annex on the Movement of Natural Persons to the GATS to "Member" and "Members" shall mean "Party" and "Parties," respectively, in this Agreement;
2.    References in the Annex on the Movement of Natural Persons to the GATS to the "Agreement" shall mean Chapter III of this Agreement; and
3.    References in the Annex on the Movement of Natural Persons to the GATS to "Parts III and IV of the Agreement" shall mean Articles 5, 6, 7 and 8 of Chapter III of this Agreement.

## Annex on Telecommunications

The Parties agree that the Annex on Telecommunications to the WTO Agreement on Trade in Services (GATS) is hereby incorporated into this Agreement by reference, *mutatis mutandis*, as if its provisions were fully set forth herein, with the exceptions of Paragraph 6 and Paragraph 7 of such Annex which shall not be so incorporated.

For greater clarity, the Parties understand that references in the Annex on Telecommunications to the GATS to "Member" and "Members" shall mean "Party" and "Parties," respectively, in this Agreement.

**Telecommunications Reference Paper**

The Parties agree that the Telecommunications Reference Paper ("Reference Paper") to the WTO Agreement on Trade in Services (GATS), as contained in the attachment to WTO document GATS/SC/90/Suppl.2, is hereby incorporated into this Agreement by reference, *mutatis mutandis*, as if its provisions were fully set forth herein.

For greater clarity, the Parties understand that references in such Reference Paper to "Member" and "Members" shall mean "Party" and "Parties," respectively, in this Agreement.

**ANNEX G**

**UNITED STATES**

**Listing of Article 2 Exemptions**

The United States' Listing of Article 2 Exemptions is the authentic List of Article II (MFN) Exemptions of the United States of America to the WTO General Agreement on Trade in Services ("GATS"), as amended from time to time.

**Schedule of Specific Commitments of Trade in Services**

1.    Except as provided in paragraph 2, the Schedule of the United States is the authentic Schedule of Specific Commitments of the United States of America to the WTO General Agreement on Trade in Services ("GATS"), as amended from time to time.

2.    With respect to the financial services described in subparagraphs (x) and (xi) of paragraph 5(a) of the GATS Annex on Financial Services, as incorporated into this Agreement by reference, the Schedule of the United States is the authentic Schedule of Specific Commitments of the United States of America to the WTO GATS, as amended from time to time, with the following modifications:

    A.    with respect to mode 1) (cross-border trade), the United States shall be unbound for the market access column;

    B.    with respect to mode 3) (commercial presence), only the establishment of representative offices shall be permitted.

# CHAPTER IV

# DEVELOPMENT OF INVESTMENT RELATIONS

## Article 1
## Definitions

For the purpose of this Chapter, Annex H, the exchanged letters on Investment Licensing Regime, and, with respect to a covered investment, Articles 1 and 4 of Chapter VII:

1.   "investment" means every kind of investment in the territory of a Party owned or controlled directly or indirectly by nationals or companies of the other Party, and includes investment consisting or taking the form of:

   A.   a company or enterprise;

   B.   shares, stock, and other forms of equity participation, and bonds, debentures, and other forms of debt interests, in a company;

   C.   contractual rights, such as under turnkey, construction or management contracts, production or revenue sharing contracts, concessions, or other similar contracts;

   D.   tangible property, including real property, and intangible property, including rights, such as leases, mortgages, liens and pledges;

   E.   intellectual property, including copyrights and related rights, trademarks, patents, layout designs (topographies) of integrated circuits, encrypted program-carrying satellite signals, confidential information (trade secrets), industrial designs and rights in plant varieties; and

   F.   rights conferred pursuant to law, such as licenses and permits;

2.   "company" means any entity constituted or organized under applicable law, whether or not for profit, and whether privately or governmentally owned or controlled, and includes a corporation, trust, partnership, sole proprietorship, branch, joint venture, association, or other organization;

3.   "company of a Party" means a company constituted or organized under the laws of that Party;

4.   "covered investment" means an investment of a national or company of a Party in the territory of the other Party;

-44-

5.      "state enterprise"  means a company owned, or controlled through ownership interests, by a Party;

6.      "investment authorization" means an authorization granted by the foreign investment authority of a Party to a covered investment or a national or  company of the other Party;

7.      "investment agreement" means a written agreement between the national authorities of a Party and a covered investment or a national or company of the other Party that (i) grants rights with respect to natural resources or other assets controlled by the national authorities and (ii) the investment, national or company relies upon in establishing or acquiring a covered investment;

8.      "UNCITRAL Arbitration Rules" means the arbitration rules of the United Nations Commission on International Trade Law;

9.      "national" of a Party means a natural person who is a national of a Party under its applicable law;

10.    an "investment dispute" is a dispute between a Party and a national or  company of  the other Party arising out of or relating to an investment authorization, an investment agreement or an alleged breach of any right conferred, created or recognized by this Chapter, Annex H, the exchanged letters on Investment Licensing Regime, and Articles 1 and 4 of Chapter VII with respect to a covered investment;

11.    "non-discriminatory" treatment means treatment that is at least as favorable as the better of national treatment or most favored nation treatment;

12.    "ICSID Convention" means the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, done at Washington, March 18, 1965; and

13.    "Centre" means the International Centre for Settlement of Investment Disputes Established by the ICSID Convention.

**Article 2**
**National Treatment and Most-Favored Nation Treatment**

1.      With respect to the establishment, acquisition, expansion, management, conduct, operation and sale or other disposition of covered investments, each Party shall accord treatment no less favorable than that it accords, in like situations, to investments in its territory of its own nationals or companies (hereinafter "national treatment") or to investments in its territory of nationals or companies of a third country (hereinafter "most favored nation treatment"), whichever is most favorable (hereinafter "national and most favored nation treatment").

-45-

Each Party shall ensure that its state enterprises, in the provision of their goods or services, accord national and most favored nation treatment to covered investments, subject to the provisions of paragraph 4.3 of Annex H.

2. A. A Party may adopt or maintain exceptions to the obligations of paragraph 1 in the sectors or with respect to the matters specified in Annex H to this Agreement. In adopting such an exception, a Party may not require the divestment, in whole or in part, of covered investments existing at the time the exception becomes effective.

B. The obligations of paragraph 1 do not apply to procedures provided in multilateral agreements concluded under the auspices of the World Intellectual Property Organization relating to the acquisition or maintenance of intellectual property rights.

## Article 3
## General Standard of Treatment

1. Each Party shall at all times accord to covered investments fair and equitable treatment and full protection and security, and shall in no case accord treatment less favorable than that required by applicable rules of customary international law.

2. Each Party shall in no way impair by unreasonable and discriminatory measures the management, conduct, operation and sale or other disposition of covered investments.

## Article 4
## Dispute Settlement

1. Each Party shall provide companies and nationals of the other Party with an effective means of asserting claims and enforcing rights with respect to covered investments.

2. In the event of an investment dispute, the parties to the dispute should attempt to resolve the dispute through consultation and negotiation, which may include the use of non-binding third-party procedures. Subject to paragraph 3 of this Article, if the dispute has not been resolved through consultation and negotiations, a national or company of one Party that is a party to an investment dispute may submit the dispute for resolution under one of the following alternatives:

A. to the competent courts or administrative tribunals of the Party in the territory of which the covered investment has been made; or

     B.     in accordance with any applicable, previously agreed dispute-settlement procedures; or

     C.     in accordance with the terms of paragraph 3.

3.    A.    Provided that the national or company concerned has not submitted the dispute for resolution under sub-paragraph 2.A or B, and that ninety days have elapsed from the date on which the dispute arose, the national or company concerned may submit the dispute for settlement by binding arbitration:

        (i)    to the Centre, if both Parties are members of the ICSID Convention and the Centre is available; or

        (ii)   to the Additional Facility of the Centre, if the Additional Facility is available; or

        (iii)  in accordance with the UNCITRAL Arbitration Rules; or

        (iv)  if agreed by both parties to the dispute, to any other arbitration institution or in accordance with any other arbitration rules.

     B.    A national or company, notwithstanding that it may have submitted a dispute to binding arbitration under sub-paragraph 3.A, may seek interim injunctive relief, not involving the payment of damages, before the judicial or administrative tribunals of a Party, prior to the institution of the arbitral proceeding or during the proceeding, for the preservation of rights and interests.

4.    Each Party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice of the national or company under sub-paragraph 3.A(i), (ii), (iii) or the mutual agreement of both parties to the dispute under sub-paragraph 3.A(iv). This consent and the submission of the dispute by a national or company under sub-paragraph 3.A shall satisfy the requirement of:

     A.    Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958, for an "agreement in writing;" and

     B.    Chapter II of the ICSID Convention (Jurisdiction of the Centre) and the Additional Facility Rules for written consent of the parties to the dispute.

5.    Any arbitration under sub-paragraph 3.A(ii), (iii) and (iv) shall be held in a state that is a party to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958.

6.    Any arbitral award rendered pursuant to this Chapter shall be final and binding on the parties to the dispute. Each Party shall carry out without delay the provisions of any such award and provide in its territory for the enforcement of such award. Each Party's

enforcement of an arbitral award issued in its territory shall be governed by its national law.

7.      In any proceeding involving an investment dispute, a Party shall not assert, as a defense, counterclaim, right of set-off, or for any other reason, that indemnification or other compensation for all or part of the alleged damages has been received or will be received pursuant to an insurance or guarantee contract.

8.      For the purposes of this Article and of Article 25(2)(b) of the ICSID Convention with respect to a covered investment, a company of a Party that, immediately before the occurrence of the event or events giving rise to an investment dispute, was a covered investment, shall be treated as a company of the other Party.


## Article 5
## Transparency

Each Party shall ensure that its laws, regulations and administrative procedures of general application that pertain to or affect investments, investment agreements, and investment authorizations are promptly published or otherwise made publicly available.


## Article 6
## Special Formalities

This Chapter shall not preclude a Party from prescribing special formalities in connection with covered investments, such as a requirement that such investments be legally constituted under the laws and regulations of that Party, or a requirement that transfers of currency or other monetary instruments be reported,  provided that such formalities shall not impair the substance of any of the rights set forth in this Chapter, Annex H, the exchanged letters on Investment Licensing Regime, and, with respect to a covered investment, Articles 1 and 4 of Chapter VII.


## Article 7
## Technology Transfer

Neither Party shall mandate or enforce, as a condition for the establishment, acquisition, expansion, management, conduct or operation of a covered investment, any requirement (including any commitment or undertaking in connection with the receipt of a government permission or authorization)  to transfer technology, a production process or other proprietary knowledge except:

1.      when applying generally applicable environmental laws that are consistent with the

-48-

provisions of this Agreement; or

2.    pursuant to an order, commitment or undertaking that is enforced by a court, administrative tribunal or competition authority to remedy an alleged or adjudicated violation of competition laws.

## Article 8
## Entry, Sojourn and Employment of Aliens

1.    Each Party shall permit nationals and companies of the other Party to transfer employees of any nationality, subject to the Party's laws relating to the entry and sojourn of aliens, to their operations in the territory of the Party in the event that those employees are executives or managers or possess specialized knowledge relating to those operations.

2.    Each Party shall permit nationals and companies of the other Party to engage, within the territory of that Party, top managerial personnel of their choice, regardless of nationality, subject to the Party's laws relating to the entry and sojourn of aliens.

3.    The foregoing paragraphs shall not preclude a Party from applying its labor laws, so long as they do not impair the substance of the rights granted under this Article.

## Article  9
## Preservation of Rights

This Chapter, Annex H, the exchanged letters on Investment Licensing Regime, and, with respect to a covered investment, Articles 1 and 4 of Chapter VII, shall not derogate from any of the following that entitle covered investments in like situations to treatment more favorable than that accorded herein:

1.    laws, regulations and administrative procedures, or administrative or adjudicatory decisions of a Party;

2.    international legal obligations; or,

3.    obligations assumed by a Party, including those contained in an investment agreement or investment authorization.

## Article 10

**Expropriations and Compensation for War Damages**

1.      Neither Party shall expropriate or nationalize investments either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except for a public purpose; in a non-discriminatory manner; upon payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general principles of treatment provided for in Article 3.  Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken; be paid without delay; include interest  at a commercially reasonable rate from the date of expropriation; be fully realizable; and be freely transferable at the prevailing market rate of exchange on the date of expropriation.  The fair market value shall not reflect any change in value occurring because the expropriatory action had become known before the date of expropriation.

2.      Each Party shall accord national and most favored nation treatment to covered investments as regards any measure relating to losses that investments suffer in its territory owing to war or other armed conflict, revolution, state of national emergency, insurrection, civil disturbance, or similar events.

3.      Each Party shall accord restitution, or pay compensation in accordance with paragraph 1, in the event that covered investments suffer from losses in its territory, owing to war or other armed conflict, revolution, state of national emergency, insurrection, civil disturbance, or similar events, that result from:

    A.      requisitioning of all or part of such investments by the Party's forces or authorities, or

    B.      destruction of all or part of such investments by the Party's forces or authorities that was not required by the necessity of the situation.

**Article 11**
**Trade -Related Investment Measures**

1.      Subject to the provisions of paragraph 2, neither Party shall apply any trade-related investment measures (TRIMs) which are inconsistent with the Agreement on Trade-Related Investment Measures of the WTO.  The illustrative list of TRIMs set forth in the WTO Agreement on TRIMs ("the List") is contained in Annex I of this Agreement. TRIMs contained on the List will be considered inconsistent with this Article regardless of whether they are imposed in laws, regulations, or as conditions for individual investment contracts or licenses.

-50-

2.      The Parties agree to eliminate all TRIMs (including those contained in laws, regulations, contracts or licenses) which fall under sub-paragraphs 2(A) (trade balancing requirements) and 2(B) (foreign exchange controls on imports) of the List by the time this Agreement enters into force.  Vietnam shall eliminate all other TRIMs no later than five years after the date of entry into force of the Agreement, or the date required under the terms and conditions of Vietnam's accession to the WTO, whichever occurs first.

### Article 12
### Application to State Enterprises

  A Party's obligations shall apply to a state enterprise in the exercise of any regulatory, administrative or other governmental authority delegated to it by that Party.

### Article 13
### Future Negotiation of Bilateral Investment Treaty

The Parties will endeavor to negotiate a bilateral investment treaty in good faith within a reasonable period of time.

### Article 14
### Application to Covered Investments

The provisions of this Chapter, Annex H, the exchanged  letters on Investment Licensing Regime, and Articles 1 and 4 of Chapter VII shall apply to covered investments existing at the time of entry into force as well as to those established or acquired thereafter.

### Article 15
### Denial of Benefits

Each Party reserves the right to deny to a company of the other Party the benefits of this Chapter and Chapter V of this Agreement if nationals of a third country own or control the company and

1.      the denying Party does not maintain normal economic relations with the third country; or

2.      the company has no substantial business activities in the territory of the Party under whose laws it is constituted or organized.

**ANNEX H**

**VIETNAM**

In accordance with the provisions in Article 2 of Chapter IV, the Government of the Socialist Republic of Vietnam reserves the right to adopt or maintain exceptions to national treatment in the following sectors and matters:

1.      Vietnam may adopt or maintain exceptions to the obligation to accord national treatment to covered investments in the sectors or with respect to the matters specified below:

> Broadcasting, television; production, publication and distribution of cultural products; investment in insurance; banking; brokerage, dealership in securities and currency values, and other related services; mineral exploration and exploitation; construction, installation, operation and maintenance of telecommunication facility; construction and operation of inland water, sea and air ports; cargo and passenger transportation by railway, airway, road, sea and inland water-way  transportation; fishing and fish catching; real estate business.

2.      Sectors in which Vietnam may require that an investment project be in conjunction with the development of local raw material sources:

> Processing of paper, vegetable oil, milk, cane sugar, wood processing (except for projects using imported wood).

Such requirements for the development of local raw material sources in the above sectors may be maintained for up to 5 years from the entry into force of this Agreement.

3.      Sectors in which Vietnam may require that an investment project export at least 80% of products:

> Cement production; paints and construction paints; toiletry tiles and ceramics; PVC and other plastics; footwear; clothing;  construction steel; detergent powder; tires and inner tubes for automobile and motor bikes; NPK fertilizer; alcoholic products; tobacco; papers (including printing, and writing paper, photocopy).

Such requirements for exporting at least 80% of products in the above sectors may be maintained for up to 7 years from the entry into force of this Agreement.

4.      Except as otherwise provided in this Paragraph (including sub-paragraphs 4.1-4.6), the following exceptions to national treatment shall be applied to a covered investment of a national or company of the United States in all sectors, including but not limited to those sectors listed in paragraphs 1, 2 and 3 of this Annex:

-H1-

4.1     Requirements on investment capital:

    (a)     After the entry into force of this Agreement, nationals or companies of the United States shall be allowed to contribute, increase and reinvest capital in any currency, including Vietnamese currency originating from any lawful activity in Vietnam.

    (b)     The following requirements may be maintained for up to 3 years from the entry into force of this Agreement:

        (i)     Nationals or companies of the United States must contribute at least 30% of the legal capital of a joint venture unless a lower contribution is approved by the investment licensing agencies;

        (ii)     The legal capital of a U.S.-owned enterprise shall not be less than 30% of investment capital unless a lower proportion is approved by the investment licensing agencies;

        (iii)     A national or company of the United States that is a party to a joint venture with a Vietnamese national or company shall give a right of first refusal to the Vietnamese party with respect to the transfer of an interest in the joint venture.  An enterprise in Vietnam that is 100% owned by U.S. nationals or companies shall give a right of first refusal to Vietnamese nationals or companies with respect to the transfer of any interest in the enterprise.  In any such case, the right of first refusal may be exercised only if the offer of the Vietnamese national or company is the same in all material terms with an offer received from any third party, including with respect to purchase price, timing and method of payment. Any such transfer shall require the approval of the investment licensing agencies; and

        (iv)     Nationals or companies of the United States are not yet allowed to establish a joint stock company. An enterprise in Vietnam that is invested or owned by U.S. nationals or companies may not issue bonds or shares to the public in Vietnam.

    (c)     Nationals and companies of the United States shall not be permitted to acquire more than 30% of the shares of an equitized State enterprise.

4.2     Organization and management of joint ventures:

Vietnam may maintain the following requirements for up to 3 years from the entry into force of this Agreement:

(a)    The General Director or First Deputy General Director must be Vietnamese citizens; and

(b)    A limited number of the most important matters which relate to the organization and operation of the enterprise, comprising the appointment or dismissal of General Director, First Deputy General Director, Chief Accountant; amendments of and additions to the charter of the enterprise; approval of final annual financial statements and financial statement of capital construction; and loan for investment shall be decided on the basis of consensus.

4.3    Prices and fees of some goods and services under the State's control:

Vietnam is in the process of reforming its pricing system in order to develop a uniform set of fees and prices. With a view to creating a more attractive, non-discriminatory business environment, Vietnam shall:

(a)    upon the entry into force of this Agreement, (i) refrain from imposing new or more onerous discriminatory prices and fees; and (ii) eliminate, discriminatory prices and fees for the installation of telephones, telecommunications services (other than the subscription charge for local telephone service), water, and tourist services;

(b)    within two (2) years of the entry into force of this Agreement, eliminate, progressively, discriminatory prices and fees for registration of motor vehicles, international port charges, and for the subscription charge for local telephone service; and

(c)    within four (4) years of the entry into force of this Agreement, eliminate, progressively, discriminatory prices and fees for all other goods and services including, without limitation, electricity and air transport.

4.4    Government subsidies and supports:

Government subsidies and supports granted to domestic enterprises, which include land allocation for investment projects, preferential credits, research and development and education assistance programs and other forms of Government supports, may not be made available to nationals or companies of the United States.

4.5    Ownership, use of land and residences:

(a)    Nationals and companies of the United States are not allowed to own land and residences.  U.S. investors are allowed only to lease land for investment purposes.

-H3-

    (b)    U.S. enterprises are not yet allowed either to mortgage land use rights at foreign credit institutions operating in Vietnam or to transfer land use rights except for the case of transfers of invested assets associated with the land within the land lease period.

4.6    Notwithstanding the above reservations to national treatment for the ownership and use of land and residences, Vietnam shall create favorable conditions in exercising the mortgage and transfer of land use rights relating to covered investments including the elimination, within 3 years from the entry into force of this Agreement, of the restrictions on mortgage and transfer of land use rights mentioned in sub-paragraph 4.5(b).

# ANNEX H

# UNITED STATES

1.      The Government of the United States of America may adopt or maintain exceptions to the obligation to accord national treatment[8] to covered investments in the sectors or with respect to the matters specified below:

>       atomic energy; customhouse brokers; licenses for broadcast, common carrier, or aeronautical radio stations; COMSAT; subsidies or grants, including government-supported loans, guarantees and insurance; landing of submarine cables; and state and local measures as to which the United States may adopt or maintain exceptions to national treatment under any of its bilateral investment treaties signed between 1 January 1995, and the date of entry into force of this Agreement.

Most favored nation treatment shall be accorded in the sectors and matters indicated above.

2.      The Government of the United States of America may adopt or maintain exceptions to the obligation to accord national and most favored nation treatment to covered investments in the sectors or with respect to the matters specified below:

>       fisheries; air and maritime transport, and related activities; banking, insurance, securities, and other financial services; leasing of minerals and pipeline rights-of-way on government lands; and one-way satellite transmissions of direct-to-home (DTH) and direct broadcast satellite (DBS) television services and of digital audio services.

---

[8]With respect to the treatment accorded by a State, Territory or Possession of the United States, national treatment means treatment no less favorable than the treatment accorded thereby, in like situations, to investments of nationals of the United States resident in, and companies legally constituted under the laws and regulations of other States, Territories or Possessions of the United States.

# ANNEX I

## TRIMs -- Illustrative List

1.    TRIMs that are inconsistent with the obligation of national treatment provided for in paragraph 4 of Article III of GATT 1994 include those which are mandatory or enforceable under domestic law or under administrative rulings, or compliance with which is necessary to obtain an advantage, and which require:

   A.    the purchase or use by an enterprise of products of domestic origin or from any domestic source, whether specified in terms of particular products, in terms of volume or value of local products, or in terms of a proportion of volume or value of its local production; or

   B.    that an enterprise's purchases or use of imported products be limited to an amount related to the volume or value of local products that it exports.

2.    TRIMs that are inconsistent with the obligation of general elimination of quantitative restrictions provided for in paragraph 1 of Article XI of GATT 1994 include those which are mandatory or enforceable under domestic law or under administrative rulings, or compliance with which is necessary to obtain an advantage, and which restrict:

   A.    the importation by an enterprise of products used in or related to its local production, generally or to an amount related to the volume or value of local production that it exports;

   B.    the importation by an enterprise of products used in or related to its local production by restricting its access to foreign exchange to an amount related to the foreign exchange inflows attributable to the enterprise; or

   C.    the exportation or sale for export by an enterprise of products, whether specified in terms of particular products, in terms of volume or value of products, or in terms of a proportion of volume or value of its local production.

# CHAPTER V

# BUSINESS FACILITATION

## Article 1

1.  To facilitate business activity, and subject to the provisions of Chapters I (including Annexes A, B, C, D and E), III (including Annexes F and G) and IV (including Annexes H and I) of this Agreement, each Party shall:

    A.  permit nationals and companies of the other Party to import and use, in accordance with normal commercial practices, office and other equipment, such as typewriters, photocopiers, computers and facsimile machines in connection with the conduct of their activities in the territory of such Party;

    B.  subject to its laws and procedures governing immigration and foreign missions, permit, on a nondiscriminatory basis and at market prices, nationals and companies of the other Party access to and use of office space and living accommodations;

    C.  subject to its laws, regulations and procedures governing immigration and foreign missions, permit nationals and companies of the other Party to engage agents, consultants and distributors of either Party, on prices and terms mutually agreed between the parties, for their production and covered investments;

    D.  permit nationals and companies of the other Party to advertise their products and services (i) through direct agreement with the advertising media, including television, radio, print and billboard, and (ii) by direct mail, including the use of enclosed envelopes and cards pre-addressed to that national or company;

    E.  encourage direct contact, and permit direct sales, between nationals and companies of the other Party and end-users and other customers of their goods and services, and encourage direct contacts with agencies and organizations whose decisions will affect potential sales;

    F.  permit nationals and companies of the other Party to conduct market studies, either directly or by contract, within its territory;

    G.  permit nationals and companies of the other Party to stock an adequate supply of samples and replacement parts for after-sales service for covered investment products; and

    H.  provide non-discriminatory access to governmentally-provided products and

services, including public utilities, to nationals and companies of the other Party at fair and equitable prices (and in no event at prices greater than those charged to any nationals or companies of third countries where such prices are set or controlled by the government in connection with the operation of their commercial representations).

**Article 2**

For purposes of this Chapter, the term "nondiscriminatory" means treatment that is at least as favorable as the better of national treatment or most favored nation treatment.

**Article 3**

In case of conflict between any provision of this Chapter and any provision of Chapters I (including Annexes A, B, C, D and E), III (including Annexes F and G) and IV (including Annexes H and I), the provision of the Chapters I, III and IV shall control to the extent of the conflict.

# CHAPTER VI

## TRANSPARENCY-RELATED PROVISIONS AND RIGHT TO APPEAL

### Article 1

Each Party shall publish on a regular and prompt basis all laws, regulations and administrative procedures of general application pertaining to any matter covered by this Agreement.  Publication of such information and measures will be in a manner which enables governmental agencies, enterprises and persons engaged in commercial activity to become acquainted with them before they come into effect and to apply them in accordance with their terms.  Each such publication shall include the effective date of the measure, the products (by tariff line) or services affected by the measure, and all authorities that must approve or be consulted in the implementation of the measure, and provide a contact point within each authority from which relevant information can be obtained.

### Article 2

Each Party shall provide nationals and companies of the other Party with access to data on the national economy and individual sectors, including information on foreign trade.  The provisions of this paragraph and the preceding paragraph do not require disclosure of confidential information which would impede law enforcement or otherwise be contrary to the public interest, or would prejudice the legitimate commercial interests of particular enterprises, public or private.  For the purposes of this Agreement, confidential information that would prejudice the legitimate commercial interests of particular enterprises means specific information concerning the importation of a product that would have a significant adverse effect on the price or quantity available of such product, but shall not include information required to be disclosed under the agreements administered by the WTO.

### Article 3

Each Party shall allow, to the extent possible, the other Party and its nationals the opportunity to comment on the formulation of laws, regulations and administrative procedures of general application that  may affect the conduct of business activities covered by this Agreement.

### Article 4

All laws, regulations and administrative procedures of general application  referred to in paragraph 1 of this Article that are not published and readily available to other governments and persons engaged in commercial activities as of the date of signature of this Agreement will be made public and readily and quickly available.  Only laws, regulations and administrative procedures of general application that are published and readily available to

-54-

other governments and persons engaged in commercial activity will be enforced and enforceable.

## Article 5

The Parties shall have or designate an official journal or journals and all measures of general application shall be published in such journals. The Parties will publish such on a regular basis and make copies of them readily available to the public.

## Article 6

The Parties shall administer, in a uniform, impartial and reasonable manner all their respective laws, regulations and administrative procedures of general application of all the types described in paragraph 1 of this Article.

## Article 7

The Parties will maintain administrative and judicial tribunals and procedures for the purpose, *inter alia*, of the prompt review and correction (upon the request of an affected person) of administrative action relating to matters covered by this Agreement. These procedures shall include the opportunity for appeal, without penalty, by persons affected by the relevant decision. If the initial right of appeal is to an administrative body, there shall also be the opportunity for appeal of the decision to a judicial body. Notice of the decision on appeal shall be given to the appellant and the reasons for such decision shall be provided in writing. The appellant shall also be informed of the right to any further appeal.

## Article 8

The Parties shall ensure that all import licensing procedures, both automatic and non-automatic, are implemented in a transparent and predictable manner, and in accordance with the standards of the WTO Agreement on Import Licensing Procedures.

## CHAPTER VII

## GENERAL ARTICLES

### Article 1
### Cross-Border Transactions and Transfers

1.   Unless otherwise agreed between the parties to such transactions, all cross-border commercial transactions, and all transfers of currencies relating to a covered investment, shall be made in United States dollars or any other currency that may be designated from time to time by the International Monetary Fund as being a freely usable currency.

2.   In connection with trade in products and services, each Party shall grant to nationals and companies of the other Party the better of most-favored-nation or national treatment with respect to:

    A.   opening and maintaining accounts, in both local and foreign currency, and having access to funds deposited in financial institutions located in the territory of the Party;

    B.   payments, remittances and transfers of currencies convertible into freely usable currency at a market rate of exchange or financial instruments representative thereof, between the territories of the two Parties, as well as between the territory of that Party and that of any third country;

    C.   rates of exchange and related matters, including access to freely usable currencies.

3.   Each Party shall grant to covered investments of the other Party the better of national or most favored nation treatment with respect to all transfers into and out of each Party's territory.  Such transfers include:

    A.   contributions to capital;

    B.   profits, dividends, capital gains, and proceeds from the sale of all or any part of the investment or from the partial or complete liquidation of the investment;

    C.   interest, royalty payments, management fees, and technical assistance and other fees;

    D.   payments made under contract, including a loan agreement;

    E.   compensation pursuant to Article 10 of Chapter IV and payments arising out of an investment dispute.

4.   In all cases, treatment of cross-border transactions and transfers will be consistent with each Party's obligations to the International Monetary Fund.

5.   Each Party shall permit returns in kind to be made as authorized or specified in an investment authorization, investment agreement, or other written agreement between the Party and a covered investment or a national or company of the other Party.

6.   Notwithstanding paragraphs 1 through 5, a Party may prevent a transfer through the equitable, non-discriminatory and good faith applications (including the seeking of preliminary relief, such as judicial injunctions and temporary restraining orders) of its law relating to:

   A.   bankruptcy, insolvency or the protection of the rights of creditors;

   B.   issuing, trading or dealing in securities, futures, options, or derivatives;

   C.   reports or records of transfers;

   D.   criminal or penal offenses; or

   E.   ensuring compliance with orders or judgments in judicial or administrative proceedings.

7.   The provisions of this Article relating to financial transfers shall not preclude:

   A    a requirement that a national or company (or its covered investment) comply with customary banking procedures and regulations, provided that they do not impair the substance of the rights granted under this Article;

   B.    prudential measures in order to protect the interests of creditors and to ensure the stability and integrity of the national financial system.

## Article 2
## National Security

This Agreement shall not preclude a Party from applying measures that it considers to be necessary for the protection of its own essential security interests.  Nothing in this Agreement shall be construed to require either Party to furnish any information, the disclosure of which it considers contrary to its essential security interests.

-57-

**Article 3**
**General Exceptions**

1.    Subject to the requirement that such measures are not applied in a manner which would constitute a means of arbitrary or unjustifiable discrimination between countries where like conditions prevail, or a disguised restriction on international trade, nothing in this Agreement shall be construed to prohibit the adoption or enforcement by either Party of measures:

      A.    with respect to Chapter I, Trade in Goods, necessary to secure compliance  with laws or regulations not inconsistent with the provisions of this Agreement, including measures related to the protection of intellectual property rights and the prevention of deceptive practices;

      B.     with respect to Chapter I, Trade in Goods, referred to in Article XX of the GATT 1994; or

      C.    with respect to Chapter III, Trade in Services, referred to in Article XIV of the GATS.

2.    Nothing in this Agreement shall preclude a Party from applying its laws in respect of foreign missions as set forth in applicable legislation.

3.    Nothing in this Agreement limits the application of any existing or future agreements between the Parties on trade in textiles and textile products.

**Article 4**
**Taxation**

1.    No provision of this Agreement shall impose obligations with respect to tax matters, except that:

      A.    Chapter I, other than Article 2.1 of such Chapter, shall apply only to taxes other than direct taxes as defined in paragraph 3 of this Article.

      B.    Within Chapter IV,

            i)    Articles 4 and 10.1 will apply with respect to expropriation; and

            ii)    Article 4 will apply with respect to an investment agreement or an investment authorization.

-58-

2.    With respect to the application of Chapter IV, Article 10.1, an investor that asserts that a tax measure involves an expropriation may submit that dispute to arbitration pursuant to Chapter IV, Article 4.3, provided that the investor concerned has first referred to the competent tax authorities of both Parties the issue of whether that tax measure involves an expropriation. However, the investor cannot submit the dispute to arbitration if, within nine months after the date of referral, the competent tax authorities of both Parties determine that the tax measure does not involve an expropriation.

3.    "Direct taxes" comprise all taxes on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, and taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

## Article 5
## Consultations

1.    The Parties agree to consult periodically to review the operation of this Agreement.

2.    The Parties agree to consult promptly as arranged through appropriate channels at the request of either Party to discuss any matter concerning the interpretation or implementation of this Agreement and other relevant aspects of the relations between the Parties.

3.    The Parties agree to establish a Joint Committee ("Committee") on Development of Economic and Trade Relations between Vietnam and the United States of America. The Committee's responsibilities shall include the following:

    A.    monitoring and securing the implementation of this Agreement and making recommendations to achieve the objectives of this Agreement;

    B.    ensuring that a satisfactory balance of concessions is maintained during the life of this Agreement;

    C.    serving as the appropriate channel through which the Parties shall consult at the request of either Party to discuss and resolve matters arising from interpretation or implementation of this Agreement; and

    D.    seeking and making proposals on the enhancement and diversification of economic and trade relations between the two countries.

4.    The Committee shall be co-chaired by representatives of the Parties at the ministerial level, and have members who are representatives from the relevant agencies concerned with the implementation of this Agreement. The Committee shall meet annually or at the request of

either Party.  The location of the meetings shall alternate between Hanoi and Washington D.C., unless the Parties agree otherwise.  The organization and the terms of reference of the Committee shall be adopted by the Committee at its first session.


**Article 6**
**Relationship between Chapter IV, Annex H, Exchanged Letters, and Annex G**

As to any matter concerning investment in services not specified in Annex G, the provisions of Annex H shall apply.  However, in the event of a conflict between a  provision set forth in Chapter IV, Annex H, or exchanged letters on Investment Licensing Regime, and a provision set forth in Annex G, the provision set forth in Annex G shall prevail to the extent of the conflict.  Annex H and exchanged letters on Investment Licensing Regime shall not be construed or applied in a manner that would deprive a Party of rights provided under Annex G.


**Article 7**
**Annexes, Schedules and Exchanged Letters**

The Annexes, Schedules, and the exchanged letters on Investment Licensing Regime to this Agreement constitute an integral part of this Agreement.


**Article 8**
**Final Provisions, Entry into Force, Duration, Suspension and Termination**

1.     This Agreement shall enter into force on the day on which the Parties have exchanged notifications that each has completed the legal procedures necessary for this purpose, and shall remain in force for three years.

2.     This Agreement shall be extended for successive terms of three years if neither Party notifies the other Party of its intent to terminate this Agreement at least 30 days before the end of a term.

3.     If either Party does not have domestic legal authority to carry out its obligations under this Agreement, either Party may suspend application of this Agreement, or, with agreement of the other Party, any part of this Agreement, including MFN treatment.  In that event, the Parties will seek, to the fullest extent practicable under domestic law, to minimize unfavorable effects on existing trade relations between the Parties.

IN WITNESS THEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Agreement.

DONE at Washington D.C., in duplicate, this thirteenth day of July 2000, in the English and Vietnamese languages, each text being equally authentic.

FOR THE GOVERNMENT OF THE                    FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:                     SOCIALIST REPUBLIC OF VIETNAM: